HERBERT D. BORET and HENRY E. BENNETT, Copartners Doing Business under the Firm Name and Style of H. D. BORET, Plaintiffs, *v.* L. VOGELSTEIN & CO., INC., Defendant.

First Department, July 3, 1919.

Contract — failure to perform — burdensomeness as defense — impossibility of performance and illegality as defense — determination of contract price by market quotations in commercial paper — effect of government fixing price — unilateral contract — agreement to purchase entire production as implying agreement to sell.

Parties cannot be relieved of the performance of their contracts merely because they have been rendered difficult or burdensome, but only where by acts of law the performance thereof has become impossible or illegal.

If the government fixes the price of a commodity at a lower figure than

that agreed on by the parties to a contract and forbids sales at any other price, the contract will be thereby rendered illegal and unenforcible.

An agreement that the price of copper to be shipped to the defendant should be determined by an average of the prices quoted in the *Engineering and Mining Journal* for a given number of days before and after receipt of shipment, makes the quotations so given the basis of the price regardless of how those quotation were arrived at.

Accordingly it is not necessary that such quotations should have been the prices fixed on an open and competitive market, but the quotations control and are binding although they are merely the statement of the price of the commodity which the United States government has fixed thereon.

Where a person agrees to purchase the entire production of a plant, the seller impliedly agrees to deliver the entire production, and the contract is not unilateral.

LAUGHLIN, J., dissented.

SUBMISSION of a controversy upon an agreed statement of facts pursuant to section 1279 of the Code of Civil Procedure.

*Hiram R. Steele* of counsel [*George E. Miner* with him on the brief; *Steele, DeFriese & Steele*, attorneys], for the plaintiffs.

*Alfred G. Reeves* of counsel [*Ambrose G. Todd* with him on the brief; *Reeves & Todd*, attorneys], for the defendant.

PAGE, J.:

The plaintiffs are copartners residing and doing business in London, Eng., and made certain written contracts with the partnership of L. Vogelstein & Co. on March 20, 1916. The defendant corporation was subsequently incorporated under the laws of the State of New York and acquired all the assets and assumed all the obligations of the former partnership of L. Vogelstein & Co., including the contracts in controversy. The contracts we will call the smelting contract and the freight contracts, with an addendum to each subsequently made. They are set out in full in the statement of agreed facts. A brief statement of them is all that is necessary in this opinion. The smelting contract sets forth the agreement of the plaintiff to sell, and the defendant to purchase, the total production of copper ore, and/or copper matte (smelted copper not yet refined), in seller's option, produced by the South American Copper Syndicate, Limited, from its Aroa mines, and/or other mines in Venezuela, for a period of eight years commencing January 1, 1918, and ending

December 31, 1925. The freight contract provides for the transportation of the copper ore or matte from Tucacas, Venezuela, to New York at a specified freight charge payable on delivery at Chrome, N. J., or at any port other than New York to which the defendants may divert the same.

The controversy arises over this provision of the smelting contract:

" *Basis of Price:* Copper by wet assay less 1.3 units to be paid for at the average price of electrolytic wirebars as published in the Engineering & Mining Journal of New York, taking the average of the 7 quotations preceding and 7 quotations following the date of the arrival of the material in Chrome (15 quotations in all). * * * From the average price contained in the above 15 quotations shall be deducted 1.85 cents per pound as treatment charge both for Ore and Matte."

Prior to September 21, 1917, the *Engineering and Mining Journal,* which was and is recognized by the metal trades and industries as a standard and reliable source of information, published daily the current market price of metals, including refined copper (electrolytic wirebars) as bought and sold and dealt with in the open market, and based said quotations on information obtained from the trade and sales reported by producers, agencies and dealers in the open market; and correctly stated how quotations were obtained as follows: " The above quotations are our appraisal of the average of the major markets based generally on sales as made and reported by producers and agencies, and represent to the best of our judgment the prevailing values of the metals for the deliveries constituting the major markets, reduced to basis of New York cash, except where St. Louis is the normal basing point. The quotations for electrolytic copper are for cakes, ingots and wirebars."

The statement of facts continues, that war was declared between the United States and Germany on the 6th day of April, 1917, and has continued down to date; and that on or about the 21st day of September, 1917, the President and government of the United States established, fixed and prescribed the sum or amount of twenty-three and one-half cents per pound at which refined copper (electrolytic wirebars)

should be bought and sold in the United States, which sum was less than the price at which refined copper was being bought and sold in the open market in the United States on or before the said 21st day of September, 1917; and since that time the said *Engineering and Mining Journal* of New York has quoted from day to day the sum or amount thus fixed by the government of the United States, and has correctly published from day to day the following notice, and correctly stated (the words in parenthesis quoted below, showing the change from the notice published before September 21, 1917): " The above quotations (except as to copper, the price for which has been fixed by agreement between American copper producers and the U. S. Government, wherein there is no free market) are our appraisal," etc., as above.

On or about January 4, 1918, before any shipment of copper ore or matte had been made to the defendant under the contracts, the plaintiffs notified the defendant that they accepted all the modifications introduced by government regulations, and insisted that the documents set forth in the agreed statement contained and specified valid and enforcible contracts. On or about November 28, 1917, and before the arrival in the United States of any shipment of copper ore or matte by plaintiffs to defendant under or by virtue of anything contained in the said contracts, the defendant notified the plaintiffs that it regarded any contract that may have existed by virtue of the documents set forth in the agreed statement as rendered null and void by reason of the conditions created by the action of the United States government, and any contract that may have existed by virtue of the documents set forth as above stated as likewise and for the same reason rendered null and void and unenforcible, and defendant thereupon declined and refused to accept or transport any copper ore or matte under said contracts.

That on or about June 30, 1918, a shipment of copper ore and matte made by plaintiffs arrived in the United States, and by mutual consent of the parties hereto, and without prejudice to the rights of either of them and without recognizing any contract as there existing, the defendant consented to receive said shipment, pay the freight and dispose of the said ore and matte for account of whom it may concern, and

accordingly defendant received said shipment of ore and matte, disposed of the same and rendered an account thereof, charging plaintiffs with freight and incidental expenses, including commissions of its London agent, and remitted the net remaining proceeds to plaintiffs; that during the last two months of 1917 and all of 1918 to date, the government of the United States, acting through the War Department and the " War Trade Board," has ·refused to allow shipments of copper from South America to this country, except upon the obtaining of a permit or license for such shipment from the War Trade Board; that during said time plaintiffs and defendant, on behalf of plaintiffs, made numerous applications to said War Trade Board for permits to import copper ore and matte from South America, but said permits have been refused, except for the importation of the shipment, the payment for which is the subject of this action, and one later shipment, which is being handled in the same way as the last. shipment, but the assays for which have not yet ·been completed.

That there is no controversy between plaintiffs and defendant as to the terms and conditions under which said above-mentioned ore and matte were dealt with and disposed of by the defendant, or with the price at which they were sold, or the assays or weights or other matters connected therewith, but the controversy hereby submitted for decision is, whether or not upon the foregoing facts, the plaintiffs are entitled to judgment against the defendant for the sum of $9,996.80, and deciding and adjudging that said documents contain or set forth valid and enforcible contracts under all the conditions, provisions and circumstances herein specified; or whether the defendant is entitled to judgment or a decision that the plaintiffs have no cause of action and deciding and adjudging that said documents do not set forth any contract or agreement that is valid and enforcible under the conditions, provisions and circumstances herein specified. The parties agree that if all of said instruments bearing date respectively March 20, 1916, and May 8, 1916, contain or set forth valid and enforcible contracts under all the conditions, provisions and circumstances as herein set forth, then there is due from

the defendant to the plaintiffs the sum of $9,996.80, in addition to the amount heretofore remitted by defendant to plaintiffs on account of said copper ore and matte shipped and dealt with as thereinbefore dealt with as above stated, and that if on the contrary no such valid and enforcible contracts are set forth by said documents, then the plaintiffs are not entitled to recover anything of the defendant.

The plaintiffs claim that they having consented to accept the lower price as fixed by the order of the United States government in payment for copper to be delivered by them to the defendant under the said contracts, the acts of the United States government in fixing the price at which refined copper could be bought and sold in the United States does not in any way affect the validity of the said contracts; and also that any restriction imposed as to importation of copper is immaterial for the purposes of this case, for the reason that the particular shipment which is the subject of this action reached the United States under the conditions as hereinbefore stated; and the plaintiffs accordingly claim that both of said contracts are valid and binding.

The defendant claims:

(a) That under all the conditions, provisions, circumstances and facts herein set forth, including the acts of the President of the United States and the United States government, any contract or agreement contained in or set forth by said documents and referred to herein as the smelting contract has been rendered void, and, therefore, plaintiffs are not entitled to receive anything from the defendant.

(b) That the documents set forth herein and referred to as the freight contract do not state any contract or agreement that is inherently valid and enforcible; and even if they had stated any contract that was inherently valid or enforcible, that the same was rendered void and unenforcible by the voiding of the smelting contract, without which there was and is no material to be transported.

In the submission the facts with reference to the fixing of the price of copper at twenty-three and one-half cents per pound are not stated. In one place it is stated that the President and government of the United States fixed and established the price. Then it is stated that the price was

fixed by agreement between the American copper producers and the United States government. My first impression was that the submission could not be determined without an amendment or a resubmission with a more full statement of the facts. On further reflection, I am of opinion that the controversy can be determined upon the record before us. From the stipulated facts, it is apparent that the parties have agreed that the conditions and regulations existing have fixed and determined their rights to the same extent as though the price had been fixed by the government through congressional action and presidential proclamation. Therefore, although a careful search has failed to reveal any act of Congress that either fixed the price of copper, or authorized the President or any executive department or commission to do so, in my opinion it makes no difference whether the price was established by governmental authority or agreement of the producers of copper with the government. The fact is, that the conditions and regulations established the market price of copper at twenty-three and one-half cents per pound at the date of the delivery of the copper in question, and that such price was quoted in the *Engineering and Mining Journal* as the then prevailing market price. The price was less than the price that had prevailed immediately before September 21, 1917. But the contract had provided for a contingency of the price dropping as low as sixteen cents per pound. The plaintiffs had expressed their satisfaction with the price of twenty-three and one-half cents, and notified the defendant that they would abide by it and perform their part of the contract in accordance therewith. The contract did not fix a price. It clearly expressed the intention of the parties that the copper was to be paid for at the prevailing market price at the time of the various deliveries. The contract was entered into after all the great powers except the United States had become involved in the war with Germany. It was to extend eight years. The parties must have contemplated that unusual and abnormal market conditions would be occasioned by the war, and that there was a possibility of the United States becoming involved, and that the performance of the contract might have been rendered difficult or burdensome. Parties cannot be relieved from the performance of their contracts merely

for those reasons, but only where by acts of law the performance thereof has become impossible or illegal. (*Baker* v. *Johnson*, 42 N. Y. 126; *City of Yonkers* v. *Yonkers E. L. & P. Co.*, 173 App. Div. 477.) If the contract had fixed the price of copper at a figure higher than twenty-three and one-half cents, and the government of the United States had thereafter legally fixed the price at twenty-three and one-half cents and forbidden sales at any other price, the contract would have been rendered illegal and unenforcible. But that is not the case; the price was to be the prevailing market price as quoted in the *Engineering and Mining Journal,* whether that price was determined by prices demanded by the producers and acquiesced in by purchasers, as shown by sales, or by agreement among the purchasers, or by the government. The price that other purchasers paid at the time of the various deliveries, as ascertained and published in the said journal, was the price the defendant agreed to pay.

The argument of the counsel for the defendant is. somewhat inconsistent, in that it is claimed that the parties had designated the *Engineering and Mining Journal* as a valuer to fix the price, and also argues that the price was to be fixed by the prices established in an open and competitive market. Neither contention is correct. The *Engineering and Mining Journal* was not to value and fix the price of this copper. Its statement of the prevailing market price was recognized and adopted by the parties as a correct statement. Payments were to be made on the basis of the market price as stated therein. Whether there was competition or agreement among the sellers of copper was immaterial. The payment was to be made at the market price as stated in that journal, and as has been stated, it quoted twenty-three and one-half cents per pound as the market price at the time the copper was received at Chrome, and that is the price that the defendant was obligated to pay.

The effect of the embargo on the importation of copper upon the contract is not necessary to determine, as this shipment of copper was delivered under the terms of the contract, and, therefore, was not affected by the embargo. We merely hold that in so far as the contract was executed by the plaintiffs, the defendant was bound on its part to pay.

Neither is there any merit in the contention that, as the plaintiffs were not bound to furnish any specified quantity of copper for shipment, the freight contract was void. The defendant's counsel correctly says that the freight contract and smelter contract are so mutually interdependent as in effect to constitute a single contract. In the smelting contract the plaintiffs agree to sell the entire production of the mines; therefore, it was the entire production of the mines that the defendant was to transport. It is well settled that where a party agrees to purchase the entire production of a plant, the seller impliedly agrees to deliver the entire production, and that the contract is not unilateral.

Judgment should be rendered for the plaintiffs for the sum of $9,996.80.

CLARKE, P. J., DOWLING and MERRELL, JJ., concurred; LAUGHLIN, J., dissented.

Judgment directed for plaintiffs for the sum of $9,996.80. Order to be settled on notice.