PATRICK McGOVERN and CHARLES L. PERRIN, Respondents, *v.*
THE CITY OF NEW YORK, Appellant.

First Department, July 14, 1922.

Municipal corporations — city of New York — action based on contract
for construction of subway — oral agreement by defendant to pay
plaintiff increased cost due to advance in cost of labor, etc., without
consideration and not warranted by Rapid Transit Act — performance
of contract after alleged breaches by defendant constituted waiver
thereof — recovery in absence of consideration would violate State
Constitution, art. 3, § 28 — constitutional law — Laws of 1921, chap.
711, making increased cost valid claim against city is unconstitutional
as violation of State Constitution, art. 3, § 28.

In an action to recover the increased cost of the construction of a subway, the plain-
tiffs alleged that after the work was commenced, the workmen demanded an
increase in wages over the then prevailing rate; that the Public Service Com-
mission insisted that the work must not be interrupted and that the increase
must be paid, and assured the plaintiffs that some way would be found to repay
them; that the Public Service Commission agreed that it would endeavor to
procure legislation authorizing the payment of such increased cost; that a little
later another demand was made by the workmen for another increase in wages and
the said Commission agreed to act under and exercise the power and authority
conferred upon them by the Lockwood Law (Laws of 1918, chap. 586), and
agreed that if the plaintiffs would pay the increased wages, the defendant would
reimburse them, but the defendant refused to carry out such agreement and the
plaintiffs notified their workmen that they would not continue to pay said
increased wages until the defendant would make a binding agreement or put said
Lockwood Law into operation; that the workmen struck and threatened to pre-
vent further prosecution of the work unless the increase was paid; that thereupon
the defendant agreed to pay the amount paid out by the plaintiffs on account of
the increased wages and would, if necessary, cancel and place said contracts
under the operation of the Lockwood Law so that the plaintiffs would have the
full benefit of the relief contemplated, and defendant also agreed to settle and
pay all legal claims for damages for breaches of the contract on its part, which
still existed unsettled in favor of the plaintiffs; that said Commission was
instrumental in having the said Lockwood Law enacted; and that the defendant
failed, neglected and refused to place in operation said Lockwood Law.

*Held,* that the complaint read in its entirety shows that there was no enforcible
agreement made by the defendant modifying the original contract between the
parties, which modification if entered into as claimed by plaintiffs, would have
increased the cost of the subways by many millions of dollars;

That if said modification had been made, it was not warranted by the Rapid
Transit Act, which strictly controlled the contract.

Furthermore, said modification did not rest upon any legal consideration inasmuch
as the plaintiffs were bound, under the original contract, to do exactly what they
agreed to do under the alleged modified contract.

A new consideration was not created by the abandonment by the plaintiffs of
their right to withdraw from the performance of the contract by reason of defend-
ant's alleged breaches of its contract with plaintiffs, for it appears that the

plaintiffs continued to perform the contract after defendant's alleged breaches had occurred, and that would constitute a waiver.

The obligation rested upon the plaintiffs to make all lawful efforts to prevent strikes and to make all reasonable efforts to end them, and if the work could only be resumed by paying the increased wages, it was obligatory upon the plaintiffs to pay such increased wages, and the promise on the part of any officials of the city of New York or the Public Service Commission to pay additional compensation to insure the plaintiffs' performance of their contract was without consideration.

There being no legal consideration to uphold the alleged modified contract, there can be no recovery thereon under common-law rules or under any legislative relief enactments, since to do so would be to violate section 28 of article 3 of the State Constitution providing that " the Legislature shall not, nor shall the common council of any city, nor any board of supervisors, grant any extra compensation to any public officer, servant, agent or contractor."

Chapter 711 of the Laws of 1921, providing in effect that as to contracts for the construction of public works made prior to April 6, 1917, other than a war contract, which have been proceeded with or completed during the period of the war, at an increased cost due to the existence of the war, any damage occasioned by such increased cost in the performance of the work shall be a valid and legal claim against and an obligation of the State, county, municipality or political division of the State with or for which said contract was made, is unconstitutional and void as a violation of said section 28 of article 3 of the State Constitution.

Page and Smith, JJ., dissent, with opinion.

Appeal by the defendant, The City of New York, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 13th day of October, 1921, overruling demurrers to the fourth, fifth and sixth causes of action, stated in the complaint, which were interposed on the ground that it appears on the face of each cause of action that it does not state facts sufficient to constitute a cause of action.

*John P. O'Brien, Corporation Counsel [Clarence J. Shearn of counsel], for the appellant.*

*Thomas F. Conway [Joseph A. Kellogg and Thomas E. O'Brien with him on the brief], for the respondents.*

Greenbaum, J.:

The action arises out of a contract dated August 3, 1916, made by the plaintiffs with the city of New York acting by the Public Service Commission for the construction of part of what is known as route 61, a part of the Broadway-Fourth Avenue Rapid Transit railroad.

The contract provided that the work to be done thereunder was to be completed on or before the 3d day of February, 1919, for the agreed sum of $4,194,797. The complaint is most voluminous. To a large extent it consists of evidentiary matter

reciting labor troubles, conditions and negotiations leading up to the alleged agreements upon which the claims of plaintiffs are based.

The alleged facts set forth in the three causes of action, which are attacked by the demurrer, are identical in substance and differ merely in respect of the measure of damages.

The action was commenced on February 3, 1920. The complaint was served on February 26, 1921. The complaint so far as it relates to the three causes of action under review alleges that at the time of the execution of the plaintiffs' contract " and continuously until June, 1918, and for a long period thereafter, there were twenty-eight (28) subway contracts " outstanding and in the process of performance held by different contractors, and that the total amount agreed to be paid by the city under all of these contracts amounted to approximately $65,000,000, and that in June, 1918, there remained undone and unperformed under these contracts work and materials aggregating at contract prices the sum of approximately $19,000,000.

It is alleged that at the times mentioned in the complaint the various subway contractors were associated together under a corporation known as the General Contractors Association, which acted for the plaintiff and the other contractors and in their behalf entered into collective agreements presumably with labor unions interested in subway construction for the purpose of safeguarding the contractors with respect to the wages to be paid for labor until the completion of the contracts.

It is further alleged that, despite these precautions taken by the contractors, " certain classes of the workmen " of the plaintiffs as well as of the other contractors demanded an increase in the wages over the then prevailing rate; that conferences were thereafter had not only with the workmen and the contractors, but with the chairman of the Public Service Commission, who advised the contractors to yield to the labor demands, as a result of which the workmen agreed to accept certain formulated increases in wages to be operative as to some of them during the year 1917 and as to others during 1917 and 1918; that these agreements were violated by the workmen in February, 1917; that conferences were again called; that the Public Service Commission insisted " that the subway work must not be interrupted and that to prevent its interruption the said last increase in the scale of wages demanded by said workmen should and must be granted and paid by plaintiffs and said other contractors, respectively, for the future in order to avert a strike, * * * and that there was a way and a way would be found on the part of the defendant and said Commission

for the defendant to assume and pay, and that the defendant would assume and pay or repay to plaintiffs and said other contractors, respectively, the amount of the increases in cost occasioned, as above stated, or which in the future would be occasioned or caused plaintiffs and said other contractors respectively by the last-mentioned increase in wages demanded, in case the same was put into effect and paid," and that said " Commission further stated and assured plaintiffs and said other contractors, respectively, then and theretofore that in its judgment a declaration of a state of war was then imminent between the United States and the Imperial German Government, and that the declaration and existence of such a war would probably further add to the increase in cost both of labor and materials in the prosecution of said subway work; " that the " Commission would endeavor to procure or co-operate with said contractors in procuring legislation giving the defendant, if necessary, added and adequate power and authority to pay, repay or reimburse said plaintiffs and said other contractors, respectively, for the increased cost occasioned by compliance, on their part, with said last demand for an increase and said prior increases paid by them, as well as any future increase in cost that might thereafter arise in the event of said declaration or existence of a state of war and due to it or to any increased labor inefficiency following the same; " that finally the plaintiff and the other contractors yielded to the wishes of the Public Service Commission and modified their former agreement with their workmen respecting wages; that notwithstanding that the plaintiff and the other contractors had yielded again to the demands of their workmen a further demand for a large increase in wages was made after the United States was drawn into the World War; that the workmen " insisted that said increase must be paid to them from and after May 15, 1918, and served notice on plaintiffs and said other contractors, respectively, and also on the Board of Estimate of defendant and on said Commission that if said demand was not complied with and said increase not granted and put into effect and paid from and after said date, they, said workmen, would strike and stop all further construction work; but plaintiffs and said other contractors, respectively, refused to meet said demand or pay said increase, because said demand was in violation and disregard of the provisions of said agreements with said workmen above mentioned, and also because said demand exceeded the then prevailing rate of wages in New York and its vicinity in subway and similar work, and at the same time labor had become and was much less efficient, either in consequence of its scarcity or of conditions following the war, and further that plaintiffs and said

other contractors, respectively, were not obligated to prevent strikes; unless defendant would agree to pay or reimburse plaintiffs and said other contractors for the added increased cost to them, * * * and enter into and make with plaintiffs and said other contractors, respectively, a binding and enforceable agreement for that purpose and to that effect; and that if necessary in order to enable defendant to do so, both said Commission and the Board of Estimate and Apportionment of the defendant would act under and exercise the powers and authority conferred upon them by Chapter 586 of the Laws of 1918, which had been initated and procured by said Commission and said defendant pursuant to its promises to that effect hereinbefore stated, and which chapter had taken effect May 9, 1918, * * * and thereupon said Board and said Commission, acting for and on behalf of the defendant, on or about the 31st day of May, 1918, requested plaintiffs and said other contractors, respectively, to prevent said threatened strike and cessation of work, and for that purpose to waive said former agreements with their respective workmen fixing scales of wages, and to pay said workmen the increased scale demanded; and said Board and said Commission, and also other authorized agents of the defendant, promised and agreed with plaintiffs and said other contractors, respectively, that if they would and did waive said provisions of said agreements, and pay said increased demand, the defendant would pay plaintiffs and said other contractors, respectively, the amount thereof * * * and in addition thereto would pay or repay and reimburse plaintiffs and said other contractors, respectively, for any and all increases in the cost of labor and materials since April 6, 1917; * * * that thereupon plaintiffs and said other contractors, respectively, did accept said understanding or agreement and the terms thereof, and pursuant thereto and acting in reliance thereon did so immediately notify their respective workmen of the terms thereof and induced them to accept and approve the same and to continue work.''

It is further alleged that the defendant thereafter refused to carry out its agreement and that plaintiffs and the other contractors thereupon notified their workmen and the board of estimate and the Public Service Commission that it would not continue to pay said increased wages because of defendant's failure to carry out its agreement and that ." until said defendant should make and give plaintiffs and said other contractors, respectively, an enforceable and binding agreement, promise or assurance in substance and to the effect as stated and provided in said understanding or agreement, or to put chapter 586 of the Laws of 1918,

known as the Lockwood Law, into operation and give plaintiffs and said other contractors, respectively, the benefit thereof and the relief it contemplated and provided for, and said defendant having failed to do so, and no action to that effect having been taken by said Board or said Commission or said defendant said workmen on or about June 10, 1918, struck, suspended all work and immediately notified the plaintiffs and said other contractors, respectively, and said Board of Estimate and said Public Service Commission that they, said workmen, would not again resume work unless and until they were assured, and had a valid agreement to the effect promptly made and entered into between plaintiffs and said other contractors, respectively, and their respective workmen that the said workmen would be paid and assured payment for the future in accordance with the said scale of wages last demanded," and that unless the defendant complied with said demands the workmen would " scatter and obtain other employment and prevent the further prosecution of subway work."

It is further alleged that thereupon said board of estimate and apportionment and the Public Service Commission agreed that the " defendant would pay and reimburse plaintiffs and said other contractors, respectively, in addition to its and their respective contract prices, the amount or amounts of such increased wages and also the amount or amounts of the increased cost of labor and materials due to the war, from and after April 6, 1917, * * * and that if and insofar as it was or might become necessary to enable defendant to carry out and perform said agreement on its part, said Board and said Commission would cancel and place said contracts under the operation of said Lockwood Law, or modify or supplement the same, so that plaintiffs and said other contractors, respectively, would in such event have the full benefit of the relief it contemplated," and that the defendant also agreed to settle and pay all legal claims for damages " for breaches of contract, faults and defaults on the part of the defendant occurring prior to April 6, 1917, or thereafter up to June 15, 1918, and which still existed unsettled in favor of the plaintiffs or said other contractors, respectively, for the purpose of further aiding them and of financing their contracts; " that thereafter the strike was terminated and work resumed on plaintiffs' contract as well as on the other contracts and that " the promises, agreement and assurances by defendant hereinbefore set forth, to pay plaintiffs said increased cost and damages, were intended to and did modify or supplement plaintiffs' said construction contract."

The complaint also specifically alleges that at a session of the New York State Legislature in 1918, " the said Public Service Com-

mission initiated, formulated and introduced and urged the passage of said chapter 586 of the Laws of 1918, commonly known as the Lockwood Law, and requested and were given the aid and co-operation of said contractors and Contractors' Association in so doing," and that said bill became a law on May 9, 1918; that at the same session of the Legislature the Public Service Commission " approved and advised and assisted in formulating chapter 585 of the Laws of 1918, commonly known as the Walters Law."

It is also alleged that the defendant and board of estimate and apportionment and the Public Service Commission and Rapid Transit Construction Commissioner " failed, neglected and refused to place in operation said Lockwood Law as regards plaintiffs' contract or as regards any of said other contracts, although repeatedly requested by plaintiffs and said other contractors, respectively, and although they offered and stood ready to comply with each and every stipulation and requirement of said law on their part essential to enable defendant to do so."

Upon the foregoing alleged facts the plaintiffs ask damages in amounts aggregating $755,084.61 in the fourth cause of action; $372,608.43 in the fifth cause of action and $688,127.96 in the sixth cause of action.

The contract for the subway construction between the parties provides that time is of the essence of the contract and that the contractor shall complete all work covered by his contract within thirty months of its delivery. It also provides for per diem liquidated damages in the event of delay in completion of the contract, subject, however, to the provision that if the delay is occasioned by any labor strikes for which the contractor is not responsible, the Public Service Commission may extend the time for completion by the amount of the time of such delay as the Commission shall determine the contractor was subjected to by reason of the strike.

In this connection it might be well briefly to refer to the legislative enactments which were apparently designed to give relief to those who were engaged in performing public contracts during the period of the war.

The first of these acts is known as the Walters Law, being chapter 585 of the Laws of 1918. That act related to contracts for the construction of public works generally.

On the same day that chapter 585 was enacted, chapter 586 was also enacted. That act related to the " completion of the construction of essential rapid transit lines in a time of war, and the powers of the Public Service Commission for the First District, with the concurrence of the board of estimate and

apportionment of the city of New York, with respect to uncompleted contracts for such construction, entered into by the city of New York under the authority of chapter four of the laws of eighteen hundred and ninety-one as amended, commonly known as ' The Rapid Transit Act.' "

The third act, known as the Lusk Act, was an amendment of chapter 585 of the Laws of 1918 and was passed on May 13, 1921, while the instant action was pending, and is chapter 711 of the Laws of 1921.

The plaintiffs insist that regardless of the relief available to them under the legislation above mentioned the causes of action demurred to are all sufficient to entitle them to the damages which they seek. In my opinion the allegations relating to these causes of action read in their entirety show that there was no enforcible agreement made by the defendant modifying the original contract between the parties. The facts alleged merely indicate that members of the board of estimate and apportionment and of the Public Service Commission were sympathetic to the demands of the contractors engaged in subway construction; that they advised with them and promised to assist them in securing legislation which would permit the contractors to receive compensation additional to that fixed by the original contracts and indeed it is alleged as matter of fact that they actively participated in advocacy of the remedial legislation which was subsequently enacted.

What steps, if any, plaintiffs actually took to secure the benefits of the remedial legislation mentioned does not appear. There is a general allegation that the defendant, the board of estimate and apportionment and the Public Service Commission " failed, neglected and refused to place in operation said Lockwood Law as regards plaintiffs' contract," but in what respects they refused to put into operation or effect the Lockwood Law is not made apparent.

It is obvious too from what has been stated that if the position of the plaintiffs be correct the effect of the alleged promises of the Public Service Commission and the board of estimate and apportionment would be to increase the prices fixed under the original contracts for the various subway contracts by many millions of dollars, without even the formality of a written agreement to show that the city had consented to modify the original contracts by providing additional compensation to the plaintiffs and the other contractors beyond that prescribed by the contracts so as fully to reimburse them by reason of the unexpected increase in wages and cost of materials which had taken place after the making of the contracts.

But assuming that the Public Service Commission and board of estimate and apportionment had modified the contract as plaintiffs allege, it seems to me that such modification is not warranted by the Rapid Transit Act and does not rest upon any legal consideration. It was the duty of the plaintiffs to proceed with the performance of the contract no matter how onerous and unprofitable it might prove to be. If there was a strike for which the plaintiffs were not responsible, they would be entitled to an extension of time for performance to the extent of the delay occasioned by the strike.

At the outset it is to be borne in mind that the making of a subway contract is strictly controlled by the Rapid Transit Act and the complaint is barren of any allegations showing that the Public Service Commission as a board or the board of estimate and apportionment as a legal body had taken any action for the modification of the original contract in the respects claimed by the plaintiffs. It is probably needless to say that such a modification of the agreement as is here claimed was not authorized under any of the provisions of the original contract, or the Rapid Transit Act. It is to be presumed that the contractor took his chances as to the conditions that might arise after the making of the contract in the matter of an increase in wages or costs of material.

A recovery may not be predicated upon a moral consideration. (*Gordon* v. *State of New York*, 233 N. Y. 1.)

It is claimed by plaintiffs that a new consideration was created by their abandonment of the right to withdraw from performance of the contract by reason of defendant's alleged breaches of its contract with plaintiffs, citing *De Cicco* v. *Schweizer* (221 N. Y. 431). But as the learned counsel for the appellant points out in his brief the promise in that case was by a third party to induce the parties to perform their contracts and he incidentally aptly quotes from the opinion where the court stated (at p. 433): " There is a general acceptance of the proposition that where A is under a contract with B, a promise made by one to the other to induce performance is void."

Moreover, it appears here that plaintiffs continued to perform the contract after the defendant's alleged breaches had occurred. They must, therefore, be deemed to have waived the breaches. (*Leahy* v. *Lucius Engineering Co.*, 186 App. Div. 354, 357; affd., *sub nom. Leahy* v. *Fairlie*, 227 N. Y. 660.)

The plaintiffs argue that they were under no obligation to prevent strikes and that their settlement of the strike by paying

24

increased wages was a consideration sufficient to uphold the alleged modified agreement.

I am of the opinion that the obligation rested upon the plaintiffs to make all lawful efforts to prevent strikes and to make all reasonable efforts to end them. The strike in question was limited to the matter of higher wages and no other issue was involved. It was incumbent upon the plaintiffs to secure workmen at such wages as were obtainable under then existing conditions. Besides, from a reading in their entirety of all the allegations in the causes of action under review, in connection with the allegations which refer to the strike, it is quite apparent that at that time there was a shortage of labor and a largely increased wage rate. If the work could only be resumed by paying the increased wages, it was obligatory upon the plaintiffs to pay such increased wages and a promise on the part of any officials of the board of estimate and apportionment or of the Public Service Commission to pay additional compensation to insure the plaintiffs' performance of their contracts was *nudum pactum.*

If there was no legal consideration which will uphold the alleged modified agreements, it follows that there can be no recovery thereon under common-law rules or under the legislative relief enactments, since they would be violative of section 28 of article 3 of the State Constitution which reads as follows: " The Legislature shall not, nor shall the common council of any city, nor any board of supervisors, grant any extra compensation to any public officer, servant, agent or contractor." (*Matter of Mahon* v. *Board of Education,* 171 N. Y. 263; *Stemmler* v. *Mayor, etc.,* 179 id. 473; *Gordon* v. *State of New York,* 233 id. 1.)

It is now only necessary to consider the effect of section 28 of article 3 on the legislative enactment known as the Lusk Law (*i. e.,* chapter 711 of the Laws of 1921).

That act provides in substance with respect to contracts for the construction of public works made prior to April 6, 1917, other than a war contract as therein referred to, which have been proceeded with or completed during the period of the state of war between the United States of America and the Imperial German Government, at an increased cost due to the existence of a state of war, that " any damage, loss or expense, which a court of competent jurisdiction may find to have been occasioned by increased cost in the performance of the work under such contract resulting from or due to the existence of a state of war   *   *   *   is hereby declared to be and is made a valid and legal claim against and an obligation of the State, county, municipality or political division of the State of New York with or for which said contract was made."

In view of the decision of the Court of Appeals in *Gordon* v. *State of New York* (*supra*), declaring invalid chapter 459 of the Laws of 1919, authorizing the Court of Claims to hear and determine the claims of highway contractors and make awards for the increased costs of highways constructed since the beginning of the late war, it seems to me inevitably to follow that the Lusk Amendment must be held to be unconstitutional and void. In that case the court construed a contract made in 1915. The court said as follows: " A continuance of the war and particularly the entry of this country into the conflict would necessarily result in scarcity of labor, increased cost of the same and increased cost of material with continued business depression. Confronted with that condition and outlook, claimant proposed to undertake the work under the contract. To say that he did not appreciate the risk and that his proposal to perform the work was not made in contemplation of the abnormal conditions then extant and danger of an increase of the same would be a serious reflection upon his sagacity as a business man. The unit prices to be paid by the State for labor and material were fixed by claimant in his proposal. As a contractor he was aware of the prevailing cost of labor and materials and was qualified to anticipate the conditions likely to arise during the term of the contract. At least he undertook and was willing to do so and to give a bond to secure performance on his part. Having entered into the contract, claimant became legally and equitably bound to discharge the obligation assumed by him, however onerous the burden. (*Boret* v. *Vogelstein & Co., Inc.,* 188 App. Div. 605, 611; *Columbus R., P. & L. Co.* v. *City of Columbus,* 249 U. S. 399.) Failure or refusal on the part of the claimant to perform the contract would vest in the State a cause of action for damages against him, and to such action a defense that by reason of war conditions the cost of labor and materials had increased, rendering the contract a loss to him, would be unavailing.

" The Appellate Division in the opinion there delivered said that the Legislature in the enactment of the statute of 1919 recognized claims of the character of the one in the instant case as founded in equity and justice and the claim is not only a moral obligation against the State but a legal claim as well. Liability of the State based upon equity and justice and by reason of a moral obligation has been frequently urged in this court and thus far claimant has succeeded by reason of the application of such terms. Equity and justice recognize the inviolability of contracts, protect and enforce the rights of parties thereunder, inhibit an unlawful abrogation of the same, award damages arising from a

breach thereof and likewise decree specific performance of contracts. Equity and justice do not require the State to reimburse a contractor for the increased expense incurred by him in the performance of a contract due in no measure to the act of the State. The claimant assumed the risk incident to the performance of his contract. Had the cost of labor and materials decreased rather than increased, the State under the contract would still be obligated to pay the unit prices it covenanted to pay, and equity and justice would turn a deaf ear to a suggestion by the State that the expense to claimant had been materially reduced, his anticipated profits thereby largely increased, and, therefore, a moral obligation existed upon his part to reduce the cost to the State.

" The State did not undertake to indemnify claimant against loss upon his contract. On the contrary, it required him to give a bond for a strict compliance on his part with the terms of the same. War conditions and the increased cost of labor and materials or scarcity of labor were not precipitated by the State or due to any act upon its part. So far as the record discloses, the State performed every obligation resting upon it under the contract. The contract between the claimant and the State was purely a business transaction akin to contracts between individuals. Undoubtedly claimant anticipated a profit would result from his contract. If disappointed and a loss resulted, he assumed the risk of such loss and to bear the same. A contribution to him and other contractors similarly situated by the taxpayers of the State under the statute of 1919 or in whatever form framed would operate as a dispensation of charity."

It thus follows that it is unnecessary to consider any of the other legal points raised in this case.

The order appealed from should be reversed, with ten dollars costs and disbursements, and the demurrers to the fourth, fifth and sixth causes of action sustained, with ten dollars costs.

CLARKE, P. J., and MERRELL, J., concur; PAGE and SMITH, JJ., dissent.

PAGE, J. (dissenting):

I cannot assent to the contention that there was no consideration for the agreement of the city of New York, acting through the board of estimate and apportionment and the Public Service Commission, to reimburse the contractor for the extra expense caused by the increase of wages; nor that such an agreement, and the acts of the Legislature authorizing the same, was to pay to the contractors an extra compensation or gratuity within the purview

of article 3, section 28, of the Constitution of the State of New York.

The contract under which these plaintiffs were doing the subway construction work provided: " In case the contractor shall be actually and necessarily delayed by reason of any labor strike not caused or instituted or provoked by the contractor or by any sub-contractor, agent or representative of the contractor * * * then the said date for completion shall * * * be extended by resolution of the Commission * * * by the amount of the time of such delay as determined by the Commission." The plaintiffs and the various subway contractors acting together under a corporation known as the General Contractors Association had entered into a collective bargaining agreement with the labor unions fixing the scale of wages to be paid for labor until the completion of the contract. Notwithstanding this agreement, certain classes of workmen employed by plaintiffs and other of said contractors demanded an increase over the then prevailing rate of wages. Thereupon a conference was had among the workmen demanding the increase, or their authorized representatives, the plaintiffs and the other contractors, or their authorized representatives, and the chairman of the Public Service Commission, acting and authorized to act for it. The chairman of the Public Service Commission insisted that the increase in wages be granted and paid and the plaintiffs and other contractors thereupon agreed to and did pay such increase under protest and with the understanding that no further increases be asked by the workmen. Notwithstanding this agreement, and in violation of the terms thereof, the workmen, within two months thereafter, made a demand for a further substantial increase in wages over the scale fixed by said agreement and also *over and above the then prevailing rate of wages* on subway and similar work, to take effect on April 1, 1917, and threatened to strike if the demand was not granted. The plaintiffs and the other contractors refused to comply with this demand. The workmen thereupon appealed to the Public Service Commission, which insisted that the subway work must not be interrupted and also insisted that to prevent its interruption this increase demanded by the workmen should be granted. The action of the Public Service Commission and the board of estimate and apportionment of the city of New York and the various laws passed by the Legislature of the State of New York are fully stated in the opinion of Mr. Justice GREENBAUM. In my opinion the modification of the original contract and the agreement for the city to repay to the contractors the increased cost of labor rested upon a sufficient consideration to make it enforcible.

The plaintiffs were only required to pay the prevailing rate of wages, and, therefore, when the workmen demanded pay in excess of. that rate, and threatened to strike unless their demand was granted, the plaintiffs would have been entirely within their rights in refusing the demand, and if a strike had been the result, the time for the completion of the work would have been extended by the amount of time of such delay, by the provision of the contract above quoted.    In yielding to the demands of the workmen and of the Public Service Commission and agreeing to pay a rate of wage in excess of the prevailing rate, the plaintiffs did something that they were not obliged to do and relinquished the rights to resist the demand of the workmen.    Furthermore, the delay in completion of the subway construction would be of great detriment and cause financial loss to the city.    1. In the delay in furnishing needed transit facilities, which would postpone the development of the outlying districts and, therefore, delay the increase of taxable value of those properties and the resultant increase of the revenue from taxes.    2. The city was furnishing the capital for the construction work and delay would largely add to the interest charge which the city would have to pay.    There was, therefore, a detriment to one party and a substantial pecuniary advantage to the other, which would furnish ample consideration to support the modification of the agreement, and when this agreement was authorized and ratified by the. Legislature every legal obstacle was removed to its enforcement.    The present case is clearly distinguishable from *Gordon* v. *State of New York* (233 N. Y. 1–11), in which there is no fact that would tend to show any consideration for the increase, except a moral obligation founded in equity and justice.    The court said: " Liability of the State based upon equity and justice and by reason of a moral obligation has been frequently urged in this court and thus far claimant has succeeded by reason of the application of such terms.    Equity and justice recognize the inviolability of contracts, protect and enforce the rights of parties thereunder, inhibit an unlawful abrogation of the same, award damages arising from a breach thereof and likewise decree specific performance of contracts.    Equity and justice do not require the State to reimburse a contractor for the increased expense incurred by him in the performance of a contract *due in no measure to the act of the State.*    The claimant assumed the risk incident to the performance of his contract.    Had the cost of labor and materials decreased rather than increased, the State under the contract would still be obligated to pay the unit prices it covenanted to pay, and equity and justice would turn a deaf ear to a suggestion by the State that the expense to

claimant had been materially reduced, his anticipated profits thereby largely increased, and, therefore, a moral obligation existed upon his part to reduce the cost to the State.

" *The State did not undertake to indemnify* claimant against loss upon his contract. On the contrary, it required him to give a bond for a strict compliance on his part with the terms of the same. War conditions and the increased cost of labor and materials or scarcity of labor were not precipitated by the State or due to any act upon its part. So far as the record discloses, *the State performed every obligation* resting upon it under the contract." (Italicization mine.)

The constitutional provision here invoked, as shown by the entire burden of the opinion, was that it prohibited the State or city from granting a gratuity or charity. In the instant case the plaintiffs are asking no gratuity or charity, but are asking the agreed compensation for the relinquishment of a valuable right.

In my opinion the orders overruling the demurrers should be affirmed.

SMITH, J., concurs.

Order reversed, with ten dollars costs and disbursements, and demurrers to 4th, 5th and 6th causes of action sustained, with ten dollars costs. Settle order on notice.