**Alvin GANDAL, Plaintiff,**

v.

**TELEMUNDO GROUP, INC. et al., Defendants.**

Civ. A. No. 89–2563.

United States District Court, District of Columbia.

Jan. 7, 1992.

Jeffrey Blumenfeld, Glenn B. Manishin, Blumenfeld & Cohen, Washington, D.C., for plaintiff.

Jeremiah C. Collins, John J. Buckley, Jr., Kathleen L. Beggs, Williams & Connolly, Washington, D.C., for defendants.

## MEMORANDUM OPINION
## AND ORDER

SPORKIN, District Judge.

This case comes before the Court on the plaintiff's and defendants' cross motions for summary judgment. Plaintiff moves for summary judgment on the count of the amended complaint alleging breach of contract. Defendants move for summary

judgment on that count as well as other counts alleging breach of fiduciary duty and tortious interference with contract. There are no genuine issues of material fact so the case is appropriate for disposition on summary judgment. The legal issues are divided as between the parties. Therefore plaintiff's and defendants' motions for summary judgment are both partially granted and partially denied.

*Background*

### I. The Standard for Summary Judgment.

Summary judgment may be granted to the moving party if:

"the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."

Fed.R.Civ.P. 56(c). Under *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish an element essential to that party's case and on which that party will bear the burden of proof at trial." Both sides have filed extensive memoranda, affidavits, and discovery materials regarding the complex transactions surrounding this case. While the parties do not agree on every issue, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or it is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Therefore, for the purposes of this motion, the Court accepts the following facts as not in genuine dispute.

### II. Facts

This case arises out of a dispute concerning the terms of the 1986 merger of John Blair & Company ("Blair") and a subsidiary of Reliance Capital Group, L.P. ("Reliance"). Plaintiff, Alvin Gandal, brings this suit in his capacity as a former owner of certain stock warrants[1] in John Blair and Company ("Warrants"). Defendants are Reliance, Telemundo Group, the successor corporation to Blair, and Jack Fritz and Hugh Beath, former Blair officers.

#### A. The Stock Warrants

On September 15, 1984 John Blair issued common stock purchase warrants. Each warrant had a five year life, expiring on September 15, 1989, and entitled its holder to receive one share of John Blair common stock for an exercise price of $36.75. The terms of the contract defining rights and conditions associated with the Warrants ("Warrant Agreement") are crucial to this case.

Plaintiff's contract claim rests on Section 10.5 of the Warrant Agreement. That section preserves the rights of warrantholders in the event that Blair chooses to merge with another company. Section 10.5 provides in relevant part:

"10.5 *Preservation of Purchase Rights Upon Merger, Consolidation, etc.* In case of any consolidation of the Company with or merger of the Company into another corporation ... each Holder shall have the right thereafter upon payment of the Warrant Price in effect immediately prior to such action to purchase upon exercise of each Warrant the kind and amount of shares and other securities and property (including cash) which he would have owned or have been entitled to receive after the happening of such consolidation, merger, sale, transfer or lease had such warrant been exercised immediately prior to such action; *provided however*, that no adjustment in respect of dividends, interest or other in-

---

**1.** A stock warrant is defined as, "A certificate entitling the owner to buy a specified amount of stock at a specified time(s) for a specified price. Differs from a stock option only in that options are granted to employees and warrants are sold to the public." Black's Law Dictionary at 1422 (5th ed. 1979) *citing Miller v. General Outdoor Advertising Co.*, 223 F.Supp. 790, 794 (S.D.N.Y. 1963).

come on or from such shares or other securities and property shall be made during the term of a Warrant or upon the exercise of a Warrant."

Plaintiff's Exhibit 2 at § 10.5. The intention of this provision is evident from the face of the contract. After a merger, warrantholders who chose to exercise were to be entitled to the same consideration as they would have received had they exercised immediately before the merger and therefore been common shareholders at the time of the merger. As warrantholders, they were not entitled to any of the rights or income due security holders until after they exercised, but the Warrant Agreement clearly entitled them to be treated equally to shareholders in every other respect.

Section 12 of the Warrant Agreement expressly excluded them from having the rights of shareholders prior to the exercise of their conversion rights. That section provided in relevant part:

"Section 12. *No Rights as Stockholders:* ... Nothing contained in this Agreement or in any of the Warrants shall be construed as conferring upon the Holders or their transferees the right to vote or to receive dividends or to consent or to receive notice as stockholders in respect of any meeting of stockholders for the election of directors of the Company or any other matter, *or any rights whatsoever as stockholder of the Company.*"

Defendants' Exhibit D at § 12 (emphasis added). Pursuant to this contractual term the warrantholders were not entitled to any of the same basic rights normally associated with stock ownership. Prior to the merger, Plaintiff Gandal purchased 3,000

warrants at $2.25 per warrant on December 3, 1984 and 10,000 additional warrants, some at $3.00 and some at $2.875, on October 24, 1985. Therefore, before the events surrounding the merger, plaintiff had bought 13,000 warrants for $36,625. After the terms of the merger were fixed, Plaintiff decided to speculate on the Warrants and bought an additional 142,000 Warrants for $78,118.75. All tolled, then, plaintiff purchased 155,000 Warrants for $114,743.75.[2]

### B. The Merger

On April 22, 1986 Macfadden Acquisition Corp. ("Macfadden") made an unsolicited tender offer for all of the outstanding shares of Blair common stock. The Blair board of directors, including defendants Jack Fritz, who was the President and Chief Executive Officer, and Hugh Beath, who was an Executive Vice President, resolved that the best interests of Blair stockholders would be served by resisting Macfadden's hostile takeover attempt. They began seeking a "white knight" who would make an offer that was superior to Macfadden's and thereby maximize value to Blair stockholders. That white knight ultimately turned out to be Reliance, a defendant in this case.

Reliance and Macfadden began a series of competing bids for the acquisition of Blair. Reliance proposed a two-step acquisition of Blair. The first step was to be a cash tender offer for a controlling block of Blair common stock. The second step was to be a closeout merger for all the shares not purchased in the tender offer. On June 2, 1986 Blair and Reliance entered

---

**2.** A class action was subsequently brought on behalf of the John Blair Warrant holders. The merits of that action were never adjudicated because the parties settled on October 13, 1987, before the exercise date of the Warrants, for $8.75 per warrant. Mr. Gandal opted out of this settlement, except for 25,120 of his Warrants on which he "inadvertently" participated in the settlement and for which he received $219,000. Thus, Mr. Gandal has already experienced a profit of $105,000 over the amount that he had spent for all the Warrants he ever owned. He brought this suit based on his remaining 129,880 Warrants.

Plaintiff was employed at that time as lobbyist for ADVO and regularly did analyses of the revenues of that company. At his deposition, plaintiff stated, "I felt quite confident that ADVO would go above 20 and in my innermost deepest heart, I thought it might even go into the 30's." Pl. Dep. at 90–91. Unfortunately, the "Black Monday" stock market crash occurred the week after the settlement. ADVO stock, which never had traded above 12¾ even before the crash, dropped to between $5 and $7. At the date plaintiff's Warrants expired, ADVO was at 9⅝. *See* Def. Exhibit 9.

into a merger agreement outlining the terms of Reliance's plan.

After a series of increased offers by both Reliance and Macfadden it became necessary for Reliance and Blair to amend the terms of their merger agreement. On June 19, 1986 Blair and Reliance entered into an amended merger agreement containing the following terms. Reliance would make a tender offer for sixty percent (60%) of the outstanding common stock of Blair at $31.00 per share. If the tender offer was successful, each share of the remaining forty percent (40%) of Blair common stock, those shares not held by Reliance, would be entitled to the following:

1) Each share would be converted into the right to receive a high yield debt instrument. It was to be a 12 percent 15–year junior subordinated discount debenture with a stated principal amount of $20.75. The debenture was to accrue interest without payment for a five year period, then pay the interest on the entire 15 years out over the final ten years.

2) Reliance, upon consummation of the merger, would distribute 2.57 shares of ADVO, a wholly owned subsidiary of Blair, to each Blair shareholder excluding Reliance ("ADVO dividend").[3]

The Merger Agreement provided that warrantholders would receive 2.57 shares of ADVO and a debenture similar to the ones issued shareholders but dated on the date of exercise of the Warrant. The Blair board unanimously approved these merger terms and the shareholders, including Gandal who was also a shareholder, were apprised of the merger terms.

One week after Reliance and Blair executed their amended merger agreement Macfadden again increased the amount of its hostile tender offer to $32.00 per share. A quick response was required of Reliance because its tender offer expired on July 3, 1986. On the morning of July 3, the final day of its tender offer, Reliance issued a press release stating that:

"[I]t was considering increasing by $1 in cash the consideration to be received by holders of Blair common stock in the proposed merger of its indirect wholly-owned subsidiary, JB Acquisition Corp., and Blair. If approved *the merger consideration* would consist of $1 cash, together with the previously disclosed debenture. Holders of Shares not purchased in JB Acquisition Corp.'s pending offer to purchase up to 7,000,000 shares of Blair common stock would continue to receive the planned dividend of ADVO common stock."

Plaintiff's Exhibit 16 (emphasis added). Later on that same afternoon of July 3, 1986 Blair issued a press release "clarifying" the earlier release of Reliance, declaring that:

"[Blair] will declare a dividend of $1.50 per share to shareholders of record on a date promptly after Reliance Capital Group, L.P. has purchased at least 51% of Blair's outstanding common stock pursuant to its tender offer."

Plaintiff's Exhibit 18. The $1.50 dividend was not to be paid to Reliance but only to the non-Reliance, Blair shareholders. Warrantholders were not offered either the cash dividend or any comparable cash payment upon the exercise of their warrants. Pl. Memorandum. at 10. Defendants admit that "this failure was no oversight." They argue that §§ 10.4 and 10.5 of the Warrant Agreement preclude the warrantholders from receiving the $1.50 payment because it was merely a regular cash "dividend."

With the added $1.50 offered as part of the "merger consideration," the Reliance tender offer was successful. In the eight hours between 4:00 p.m. and midnight on July 3rd, more than 7 million Blair shares were tendered to Reliance. *See Macfad-*

---

**3.** It is beyond genuine dispute that the ADVO dividend was offered by Reliance as consideration to entice Blair shareholders to support its acquisition terms over Macfadden's. As opposed to Reliance's plan to spin off the shares to Blair shareholders, Macfadden intended to ac- quire ADVO as part of Blair and sell it for $100,000. Indeed, the opinion offered to Blair's board by Salomon Brothers included the ADVO dividend in opining that the merger was fair to Blair shareholders.

*den Holdings, Inc. v. JB Acquisition Corp,* 802 F.2d 62, 64–65 (2d Cir.1986). After the closing of the successful tender offer was announced, the second step of the merger proceeded to completion.

Reliance purchased sixty percent (60%) of the Blair shares tendered on August 18, 1986. The next day the Blair Board met and formally declared both the $1.50 cash dividend and the ADVO dividend, payable on September 15, 1986. On December 24, 1986, Blair shareholders, with Reliance now the owner of a controlling block of shares, voted to approve the merger according to the announced terms.

### C. Treatment of Restricted Shares

At the time of the June 19 agreement certain provisions were made with respect to John Blair officers and employees who were holders of the company's 100,000 restricted shares. Restrictions on those relatively few shares prevented these restricted shares from vesting until after a change of control in John Blair. Thus, holders of restricted shares were barred from tendering their shares into the tender offer and receiving the $31 cash offering price. In addition, according to defendants' counsel, the restricted shares would have been subject to severe unintended tax consequences.[4]

As a result of this increased tax and lack of liquidity, the restricted shares were the subject of a separate buy out. The few holders of the company's 100,000 restricted shares sold their shares back to John Blair on September 4, 1986 for $20.75 in cash, 2.57 shares of ADVO stock, and the $1.50 cash dividend. The difference in the treatment of owners of restricted shares was due to the perceived adverse tax treatment and lack of liquidity which they would have undergone if treated the same as the public holders of the common shares and made part of the merger itself.

### D. Plaintiff's Lawsuit

Mr. Gandal never attempted to sell his Warrants on the market. Although he explored the possibility of exercising his Warrants around the time of their expiration, he declined the offer made to him. At that time he was offered by defendants the $20.75 debenture dated as of exercise and 2.57 shares of ADVO. He was not offered the $1.50 in cash. Plaintiff declined to exercise at that time. Plaintiff claims what he was offered left the Warrants 'underwater.' In other words, absent the consideration that plaintiff wanted, "the value of the warrants was less than their $36.75 exercise price, making exercise economically impossible." Pl. Memorandum at 12. Instead, Mr. Gandal allowed his Warrants to expire and instituted this lawsuit.

### Discussion

Plaintiff claims that defendants did not live up to their obligations under the Warrant Agreement. First, plaintiff asserts that upon exercise of his Warrants after the merger, the Warrant Agreement obligated defendants to offer him the same consideration as Blair paid to its restricted shareholders when it bought back those shares. Thus plaintiff contends that under his contract he should have been offered $20.75 in cash, 2.57 shares of ADVO, and the $1.50 in cash upon exercise of his Warrants. Plaintiff also alleges that defendants Fritz and Beath breached a fiduciary duty owed to him and engaged in self-

---

**4.** Counsel for the defendants represented to the Court that tax laws in place at the time of the merger would have subjected holders of the restricted shares to harsher tax treatment than the common shareholders. First, counsel indicated that the vesting of the shares upon the change in control would have been treated as a taxable event, and the shares would have been taxed at the ordinary rate, not the capital gains rate which was then available to the owners of ordinary stock. Second, counsel for the defendants represented that any payment of cash to the restricted shareholders at the time of the merger (which was first contemplated to solve the liquidity problem) would have constituted a second taxable event, subjecting them to a double taxation—once on the vesting of the shares and again on any cash payment. Thus, according to counsel, the restricted shareholders would have been subjected to an immediate and substantial tax liability not experienced by holders of publicly traded common shares. At the same time they would be barred from gaining liquidity by participating with the common shareholders in the front end of the acquisition.

dealing by their action in relation to the treatment of the restricted shares.

Second, plaintiff claims that even if he was not entitled to the consideration offered to restricted shareholders, defendants breached the Warrant Agreement by not offering to him the same "kind and amount" of consideration offered to the common shareholders in the second step of the merger. Plaintiff contends that the "amount" of consideration offered warrantholders was materially different because plaintiff was never offered the $1.50 in cash which was paid to shareholders pursuant to the July 3, 1986 Reliance–Blair press releases. Plaintiff also claims that the "kind" of consideration offered to him was in breach of the Warrant Agreement. In this regard he contends that the high yield bonds offered to him were to be 15 year bonds dated as of the date of exercise, as opposed to being dated as of the date of the merger.

### A. Fiduciary Duty

■ As a preliminary matter I dismiss all plaintiff's claims based upon anything other than his contractual rights as defined by the Warrant Agreement. As a matter of law, defendants Fritz and Beath did not breach any alleged fiduciary duty owed plaintiff by participating in the restricted share buy back. That Agreement entitled plaintiff to receive the same consideration upon a merger as if he had become a common shareholder immediately prior to the merger. Section 12 of the Warrant Agreement expressly provides that warrantholders were not to have the rights to vote, to receive notice of stockholder meetings or to have "any rights whatsoever as a stockholder of the company." Thus, the clear intent of the parties was that the duties owing to warrantholders would be the traditional contractual duties associated with holding a right to purchase common stock at certain terms in the future.

The reason for the restricted share buy back was not to provide favorable treatment to corporate insiders. Indeed, the facts show that the reason for the buy back was to soften the blow of particularly harsh treatment to which the small number of restricted shareholders would have been subject had their shares been included in the merger. Since the restricted shareholders could not participate in the cash tender offer part of the buy out transaction, they were facing the prospect of being excluded from the liquidity provided by the "front end" of the acquisition. At the same time it was believed that the restricted shareholders would have been taxed at non-capital gains rates in the "back end." [5] Common shareholders faced none of these problems. Indeed, Mr. Fritz testified at his deposition without contradiction that on an "after-tax basis" he received much less for his restricted stock in the buy back than he did from the common shares he held in the company. Fritz Dep. at 327. Indeed, no common shareholder has ever challenged the share buy back as a breach of fiduciary duty or made a claim that they should have received what the relatively few holders of the 100,000 restricted shares received. Thus, the Court finds that no alleged fiduciary duty to warrantholders was breached.

### B. Contract Claims

■ Legal disputes with respect to contract interpretation are appropriately resolved by the court on a motion for summary judgment. *Holland v. Adamar of New Jersey, Inc.*, 550 F.Supp. 646 (S.D.N.Y.1982). While the transactions surrounding this case are somewhat complex, the legal issues are capable of resolution by a straightforward application of traditional rules of contractual interpretation. A court must interpret a contract so as to give primary effect to the unambiguous terms of the contract and where necessary the intention of the parties. *See*

---

5. Plaintiff argues that "no 'double taxation' is involved" because "there were two taxable events in the course of the overall two-step transaction." Pl. reply at 16. Curiously, plaintiff's argument that no double taxation occurred views the Reliance acquisition as a series of separate transactions and therefore contradicts plaintiff's contractual claim that the acquisition ought to be viewed as one event, which was essentially a forgone conclusion upon the success of Reliance's tender offer.

*U.S. v. 0.35 of a Acre of Land, Westchester Cty.,* 706 F.Supp. 1064, 1070 (S.D.N.Y. 1988). The first step in divining the intent is to look to the express language of the terms of the contract. *Id.* In interpreting these terms, however, the court must look at the contract as a whole, reading the separate terms as they relate to one another. *See WMATA v. Mergentime Corp.,* 626 F.2d 959, 961 (D.C.Cir.1980). Thus, this Court must apply the intention expressed by the terms of the Warrant Agreement as a whole to the events as described above to reach a proper resolution of plaintiff's contract claims.

The provisions of the Warrant Agreement are unambiguous and rather straightforward. Upon a merger, warrantholders were to be treated the same as the common shareholders at the time of the merger. The warrantholders were not entitled to better treatment than the record shareholders on the date of the merger. On the other hand, the corporation was not permitted to treat the warrantholders any worse than the common shareholders.

■ Plaintiff's claim that he was entitled to receive the same treatment as restricted shareholders is without merit. The terms of the contract make it clear that the plaintiff was to be treated the same as the holders of the issuer's common shares. There is no mention at all in the Warrant Agreement concerning the restricted shares. The plaintiff therefore was not entitled to be offered $20.75 in cash as consideration for exercising his Warrant after the merger. Plaintiff's Warrants entitled him to become a common shareholder. Section 10.5, the anti-extinction clause, merely provided that in the event of a merger warrantholders would preserve their right to the same kind and amount of consideration as if "such warrant [had] been exercised immediately prior to such action." Had the plaintiff exercised his Warrant before the merger he would have become a common shareholder. The common shareholders were given the opportunity to sell up to sixty percent (60%) of their shares for $31 in cash and to receive a $20.75 high yield debenture, 2.57 shares of

ADVO, and $1.50 for the forty percent (40%) balance of their shares. The common shareholders were not offered $20.75 in cash as consideration in the merger. In effect, plaintiff seeks to be treated differently from the common shareholders. There is no factual or legal basis for such a claim.

Plaintiff's comparison between himself and the restricted shareholders is irrelevant. Plaintiff never, either before or after the merger, had the option to become a restricted shareholder. Nor, at that time, would he have wanted to. As discussed above, the restricted shares did not vest until there was a change in control. Holders of restricted shares did not have the option of tendering into the first half of the acquisition for a $31 cash payment.

The restricted shares were eliminated before the merger ever took place. They were bought back by Blair. Such shares can provide plaintiff with no basis for comparison because they were not even part of the merger. The plaintiff's claim for $20.75 in cash must therefore fail.

■ I now turn to plaintiff's claim that the offer made to the warrantholders was in violation of the provisions of the Warrant Agreement because it did not include the $1.50 in cash. Here, there is clearly merit to the plaintiff's position. Section 10.5 of the Warrant Agreement, by its terms, requires the defendants to offer the warrantholders the same consideration they would have received had they exercised their warrants immediately before the merger. The defendants breached that provision by not offering the warrantholders the $1.50 in cash they offered to the common shareholders. Thus, plaintiff as a warrantholder was entitled to be offered the $1.50 "dividend" which was announced in the July 3, 1986 press releases and was eventually paid to all non-Reliance shareholders of Blair after Reliance's successful tender offer.

Section 10.5 explicitly provides that in a merger warrantholders are entitled to the identical consideration as common shareholders. The language of this provision is unambiguous. If the common sharehold-

ers were entitled to receive $1.50 in cash as part of the merger agreement, so the warrantholders upon exercise of their Warrants would be entitled to the same consideration.

The $1.50 in cash was plainly part of the merger consideration offered to Blair shareholders as part of the second step of the merger. The offer was made in the midst of a takeover battle in which Reliance and Macfadden were both attempting to acquire John Blair. The purpose of the promised payment was to persuade Blair shareholders to tender to Reliance, not Macfadden. This was to be accomplished by raising the payment to be made to the non-Reliance holders of the remaining forty percent (40%) of Blair shares as part of the second step of the merger. Reliance's own press release of July 3, 1986 referred to the cash payment, to be paid "together with the previously disclosed debenture," as "merger consideration." Plaintiff's Exhibit 16. Blair subsequently released a press statement that same day as a "clarification" of how such merger consideration was to be paid. Plaintiff's Exhibit 18. In his deposition, defendant Fritz conceded that the "shareholders received as part of back end [of the merger] the ADVO dividend, *the cash dividend* and a bond." Fritz Dep. at 49 (emphasis added). Had plaintiff exercised and become a shareholder before the tender offer he would have received the $1.50 in cash. Because § 10.5 explicitly provides that warrantholders had the right to be offered the same consideration, including cash, as if they had become shareholders before the merger, defendants breached the merger agreement by not offering them the $1.50 in addition to the ADVO shares and the high yield bond.

Defendants contend that the $1.50 cash payment was simply an ordinary cash "dividend" and as such under the terms of the Warrant Agreement (§ 10.4) the warrantholders were not entitled to the dividend. That contention is without merit.[6] Section 10.4 of the Warrant Agreement cannot be read in isolation. It must be read as it relates to the Warrant Agreement as a whole. It is clear that under the Warrant Agreement Reliance could not diminish or extinguish the rights associated with holding a Warrant in the process of a merger. The defendants cannot avoid the import of section 10.5 and the Warrant Agreement as a whole by merely labeling a crucial element of merger consideration a "dividend." If that were the case then the defendants could have structured the back end of the merger so that even more of the consideration was in the form of a so-called dividend, in effect virtually extinguishing the economic viability of all the Warrants.[7] As it was, the $1.50 "dividend" was approximately three times larger than *the sum* of all dividends that Blair had declared in any of its previous five fiscal years.

Significantly, when the $1.50 in cash was paid, the so-called "dividend" was not paid on all shares of Blair stock. The $1.50 in

---

**6.** Interestingly, the defendants did offer the ADVO "dividend" of 2.57 shares to warrantholders upon exercise. Plaintiff correctly points out that this offer is inconsistent with defendants' reading of § 10.4 of the Warrant Agreement. Confronted with that inconsistency the defendants unconvincingly respond that the only reason that the ADVO dividend was offered was that it was a "stock dividend" and that Section 10.1(a) of the Warrant Agreement requires adjustment of the consideration to prevent dilution of the Warrants value. That reading of § 10.1, however, fails to consider the contract as a whole. That provision refers to a distribution of "Common Stock," which is defined at the outset of the Warrant Agreement as follows: "The Company proposes to issue Warrants (the "Warrants") to purchase up to in aggregate of 2,700,000 shares of its Common Stock, par value

$1.00 per share ("Common Stock") ..." Common Stock, then refers not to shares of ADVO, but to shares of Blair common stock issued at the par value as stated in the Warrant Agreement.

**7.** Defendants also argue that Section 10.5's "provided for" clause excepts them from offering the cash "dividend" to warrantholders. That argument is frivolous from the face of the contract. The clause in question provides that warrantholders receive "no adjustment in respect of dividends interest or other income on or from such shares." A careful reading of the entire text of § 10.5 reveals that the "such shares" refers not to the shares of Blair, but to shares and other securities which were offered to shareholders as part of the merger in exchange for their shares of Blair.

cash was not paid to Reliance but only to the non-Reliance shareholders, and only on the condition that Reliance's tender offer succeeded. The reason for this is simple. The cash payment constituted value offered to common stockholders in connection with the merger of Blair and Reliance, not a payment declared to distribute corporate profits or earnings to shareholders. *See In re Fosdick's Trust*, 4 N.Y.2d 646, 176 N.Y.S.2d 966, 971, 152 N.E.2d 228, 232 (1958). It was a dividend only in name, not in substance. The payment was added cash value to the merger consideration. As such, the unambiguous terms of the Warrant Agreement entitled the warrantholders to be offered the $1.50 upon exercise of their Warrants.

■ Plaintiff's claim that the Warrant Agreement entitled him to a debenture dated December 24, 1986, the date of the merger, is without merit. The common shareholders held bonds that required a delay of five years before interest was paid. Were plaintiff's bonds also dated as of the date of the merger, he would have had to wait less than the five years required of the common shareholders but would still have received the same amount of interest as those shareholders. In effect, plaintiff would have received a windfall not provided the common shareholders. Plaintiff would have received a debenture which had already accrued interest for nearly three years before he had even held it. Thus, he would be receiving more than the common shareholders received. Such unequal treatment is nowhere evidenced in the terms of the Warrant Agreement.

In fact, § 10.5 of the Warrant Agreement specifically states that the warrantholders were to receive no income earned before exercise. That section provides that "no adjustment in respect of ... interest or other income on or from such shares or other securities or property shall be made during the term of a Warrant or upon the exercise of a Warrant."[8] Thus, until the Warrant was exercised and the warrantholder became an actual owner of the securities and property offered as merger consideration, the warrantholder was not entitled to any adjustment for interest income earned on such merger consideration. Defendants complied with the terms of the Warrant Agreement by offering the plaintiff a high yield bond dated on the date that warrantholders chose to exercise their option.

■ Defendants also claim that the plaintiff only has equitable standing to bring suit based upon the 13,000 Warrants he bought before the terms of the Merger Agreement were announced. This Court disagrees. Such a rule would allow one party to breach a contract with impunity merely by announcing its intended breach publicly. That party would, in effect, have the power to unilaterally rewrite the terms of its own contractual obligations. Furthermore, the cases cited by the defendant, cases where the plaintiff sought an injunction preventing corporate action, are inapplicable to the case before this Court. This is an action at law, asking for money damages. Plaintiff's motives in buying the additional Warrants after the announcement of the merger are not before the Court and under the facts of this case cannot alter the contractual terms which legally bind the defendants.

To summarize, the terms of the Warrant Agreement were unambiguous. Plaintiff was entitled to be treated no better and had a right to be treated no worse than if he had exercised and become a common shareholder immediately before the merger. Thus, plaintiff was not entitled to be offered the $20.75 in cash, regardless of what the restricted shareholders received as part of the share buy back. Section 10.5 of the Warrant Agreement did, however, entitle plaintiff to be offered the same $1.50 in cash offered to all the shareholders. That $1.50 was merger consideration paid in cash, despite the defendants' attempt to label it a "dividend" not payable to warrantholders under § 10.4. Finally, § 10.5 did not require defendant to back date the high yield bond offered to warrantholders to the date of the merger.

---

**8.** *See* Warrant Agreement § 10.5.

Such treatment would have afforded warrantholders a windfall of accrued interest not provided common shareholders. No equitable or other grounds exist for excluding the plaintiff from asserting a claim with respect to all plaintiff's 129,880 Warrants, including those acquired by plaintiff after the announcement of the merger. All other claims asserted by the plaintiff are dismissed as being without merit.

## II. Damages

■ Since the defendants breached the Warrant Agreement, the question becomes the extent to which plaintiff was damaged by that breach. Upon payment of the exercise price of $36.75 per warrant plaintiff was entitled to receive three components of value. Plaintiff's Warrants entitled him to be offered 2.57 shares of ADVO, a $20.75 high yield bond dated on the day of exercise, and $1.50 in cash upon exercise. Defendants breached the Warrant Agreement because they did not offer plaintiff the $1.50 in cash or its equivalent.

Plaintiff claims that this breach caused his Warrants to be "underwater," or uneconomical to exercise when he attempted to do so near their date of expiration. In other words, plaintiff claims that had defendants offered him the $1.50 in cash, the total consideration offered would have exceeded the exercise price and he would have made a profit by exercising the Warrants.

Thus, the maximum amount which plaintiff could be damaged is $1.50 for each Warrant. Awarding any more than this amount would not be justified. If the package of consideration offered exceeded the exercise price by over $1.50 at any time up until the date of expiration, then plaintiff could have realized a profit immediately upon exercise, even absent the $1.50. Under these circumstances, plaintiff's duty to mitigate his damages would have required him to take the profit which was being offered to him at that time and bring suit based on the elements of value which were wrongfully denied him. *See Air Et Chaleur v. Janeway,* 757 F.2d 489 (2d Cir.1985). On September 15, 1989, the final date on which plaintiff could have exercised his Warrants, his maximum damages were $1.50 for each Warrant he held as of that date. Plaintiff cannot sue based on the value of 2.57 shares of ADVO for the simple reason that ADVO was always part of the package which he was offered.

■ This Court will award $1.50 on each of plaintiff's 129,880 Warrants, the maximum amount to which plaintiff would be entitled. It is not possible to place an exact value on the package to which plaintiff was entitled on September 15, 1989. Although ADVO was trading at 9⅝, there was no market established for the Warrants themselves or the high yield debentures.[9] Where a breach of contract has clearly been shown and plaintiff has been damaged by the defendants' breach "doubts should be resolved against the wrongdoer" in calculating the amount of damages. *Olympia Equip. Leasing v. Western Union Telegraph,* 797 F.2d 370, 383 (7th Cir.1986). *See also, Eureka Inv. Corp. v. Chicago Title Ins. Co.,* 743 F.2d 932, 942 (D.C.Cir.1984). The plaintiff cannot be penalized because he cannot prove with precision the exact amount of his damages. The defendants having breached their contract with the plaintiff, must accept responsibility for any failure in proof. Therefore, plaintiff will be awarded $1.50 per Warrant for a total of $194,820. A judgment will be entered in that amount and defendants will also be ordered to pay costs and interest.

---

**9.** Both sides agree that the debentures would be worth something less than their stated principal amount of $20.75. The defendants submitted an affidavit from an expert stating that the value of the bond was $4.75. There is no reference in that affidavit to a quoted market for the debenture. The Court finds that the affidavit submitted, without more, is insufficient for Defendants to meet their burden to demonstrate that Plaintiff's damages were less than the $1.50 per Warrant owed to Plaintiff as a result of the Defendants' breach.