Alvin GANDAL

v.

TELEMUNDO GROUP, INC., Appellant.

ADVO System, Inc., et al.

Alvin GANDAL, Appellant

v.

TELEMUNDO GROUP, INC., et al.

Alvin GANDAL

v.

TELEMUNDO GROUP, INC., et al.

Reliance Group Holdings, Inc.,
et al., Appellants.

Nos. 92–7036, 92–7037 and 92–7039.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 22, 1993.

Decided July 20, 1993.

Kathleen L. Beggs, with whom Jeremiah C. Collins, John J. Buckley, Jr., and Kevin M. Downey, Washington, DC, were on the brief, for appellants/cross-appellees Telemundo Group, Inc., et al.

Glenn B. Manishin, with whom Jeffrey Blumenfeld, Washington, DC, was on the brief, for appellee/cross-appellant Gandal.

Before: EDWARDS, RUTH BADER GINSBURG, and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Alvin Gandal, a warrantholder of an acquired corporation, appeals the district court's rejection of his tort claims against three of the defendants below as well as his unsuccessful contract claim against the surviving corporation, Telemundo Group, Inc. The warrantholder also challenges the damage remedy for his successful contract claim against Telemundo. Telemundo cross-appeals the ruling against it. The tort defendants also cross-appeal, challenging the district court's assertion of personal jurisdiction over them. Telemundo was placed in bankruptcy after oral argument, which automatically stayed the action against it. At this time, therefore, we deal only with Gandal's tort claims. We reverse the district court's ruling that it had personal jurisdiction over the tort defendants.

I.

Prior to these transactions, John Blair & Company (Blair) was a publicly traded, diversified communications and broadcasting firm incorporated in Delaware. Blair had several

wholly owned subsidiaries, including ADVO System, Inc. (ADVO), a direct mail advertising firm. In April 1986, McFadden Acquisition Corporation (McFadden) made an unsolicited, conditional tender offer for all of Blair's common stock. Blair's board of directors consulted with the firm's investment advisers and determined that the offer would not provide Blair's shareholders with adequate compensation. The board, therefore, resolved to find a more appropriate suitor (a "white knight") supposedly to maximize the shareholders' value.

After investigating various alternatives, Blair's investment bankers proposed a transaction involving a subsidiary of Reliance Capital Corporation (Reliance). First, Reliance would make a two-tiered offer for Blair stock. Reliance would agree to purchase up to 60% of Blair's stock through a cash tender offer (the "front-end" of the transaction), and assuming that the tender offer was successful (i.e., if more than 50% of all shares were tendered), Reliance would convert the remaining shares into long-term, high-yield debentures (junk bonds) through a closeout merger (the "back-end" of the transaction). Blair would then spin-off its ADVO subsidiary by issuing a stock dividend of 2.57 shares of ADVO to each Blair shareholder besides Reliance, effectively increasing the back-end compensation. A venture capital firm would then take a substantial equity position in ADVO.

After Blair made Reliance's proposal public, something of an auction for Blair followed—both McFadden and Reliance increased their offers. On June 19, 1986, Reliance made what was styled as its final offer. It proposed to pay $31.00 cash for 60% of the shares. The remaining shares would be exchanged for a 12%, 15–year bond with a face value of $20.75. The bond was to accrue interest without payment in the first five years, and then pay out the interest from all 15 years in the final 10 years. This proposal continued to assume that ADVO would be spun-off after the tender offer was successfully completed. Reliance's offer to pay cash for 60% of all shares was in practical effect an offer to buy 60% of each stockholder's shares because section 14(d)(6) of the

Williams Act, 15 U.S.C. § 78n(d)(6), required Reliance to purchase tendered shares on a pro rata basis. Reliance's offer to each stockholder, then, was worth a blended value of 60% of the cash payment plus 40% of the value of the back-end compensation (the ADVO shares and the junk bond). Following the announcement of Reliance's "final offer," McFadden increased its bid for Blair by a dollar a share. In response, on July 3, the day that Reliance's tender offer was scheduled to close, Blair announced that if the offer were successful, Blair would declare a $1.50 cash dividend on the remaining shares. The effect of the announced dividend, therefore, was to increase the blended value of the tender offer by 60 cents (40% of $1.50).

In the event, Reliance's tender offer was successful, and Blair's board of directors formally declared the cash dividend on August 19, 1986. At the same board meeting, a stock dividend consisting of 2.57 shares of ADVO was declared as contemplated by the merger agreement. The board set September 5, 1986, as the record date for both dividends. On September 15, 1986, all owners of Blair stock as of the record date (except Reliance, which now owned 60% of the Blair shares) received their dividends. The merger was not formally consummated, however, until a special shareholder meeting on December 24, 1986. At that point, the remaining Blair shares were converted into junk bonds and Blair was effectively merged out of existence.

Some Blair employees held "restricted" shares of common stock which they had received pursuant to a stock option plan. These shares did not vest unless, inter alia, there was a change in Blair's control. The shares would not vest under Reliance's offer, then, until after the tender offer had been successful, which meant that the restricted shares effectively would be excluded from the front-end of the offer. The restricted shareholders would receive only the junk bond and dividends, yet would suffer particularly onerous federal tax consequences (we are told that vesting would force the employees to recognize the full value of shares as income, and as ordinary income rather than capital gains at that).

The board, allegedly to avoid this result, resolved to have Blair purchase the restricted shares (including those held by board members) in exchange for $20.75 in cash, 2.57 shares of ADVO, and the $1.50 cash dividend. On a before tax basis, therefore, the restricted shareholders were to receive $22.25 plus 2.57 shares of ADVO. Blair's offer to purchase the restricted shares was well-received—Blair bought over 100,000 restricted shares on September 4, 1986.

Blair had issued warrants (stock options issued by the corporation for purchase by the general public) in September of 1984 in connection with a public bond offering. The warrants gave the holder an option to purchase a share of Blair common stock for $36.75 up until the expiration date, September 15, 1989. The warrant agreement, defining the warrantholders' rights, contained an anti-dilution clause which, in the event of a merger, gave warrantholders (upon payment of the exercise price) a right to the same "kind and amount" of merger consideration that the shareholders had received. In case of a *stock* dividend, a similar clause entitled the warrantholder to the same number of shares that the common shareholders had received at the time of the dividend. But the agreement provided that a warrantholder had no right to any *cash* dividends with a record date before the date on which the warrantholder exercised his option. Prior to the announcement of the merger, Alvin Gandal bought 13,000 of Blair's common stock purchase warrants. Gandal also purchased over 100,000 additional Blair warrants after Reliance's successful tender offer had been publicly announced on July 7, 1986.

Blair and Reliance announced in a June 2, 1986 merger agreement that warrantholders would be entitled to receive the ADVO shares and the junk bond upon exercise of their warrants. As noted, Blair later offered shareholders a $1.50 cash dividend but has insisted that, by the terms of the warrant agreement's "no cash dividends clause," warrantholders were not entitled to participate in the cash dividend. One warrantholder contested this interpretation and brought a class action suit for additional compensation. Blair agreed to pay $8.75 per warrant to settle this suit. Gandal, however, opted out of the settlement with the exception of certain warrants that were included due to broker error. At the time of the settlement, ADVO shares were trading as high as 12.75 per share, but in October 1987, ADVO's share price (and the Blair warrant's price) collapsed along with the rest of the market. Gandal ended up holding his warrants until they expired. One month before their expiration, he offered to exercise the warrants if Blair would give him the full compensation to which he thought he was entitled, which included the ADVO shares, the cash dividend, and the insider's cash compensation. Blair's agent rejected this offer. On the date the warrants expired, Gandal filed suit in district court.

Gandal brought contract and tort claims against various defendants. He contended that under the warrant agreement, he should have been entitled upon exercise of each warrant to both the $1.50 cash dividend and the $20.75 in cash that Blair paid for the restricted shares. Gandal also alleged that Jack Fritz (Blair's chairman of the board) and Hugh Beath (Blair's executive vice president and a board member) violated their fiduciary duty to the warrantholders by paying $20.75 for the restricted shares of Blair "insiders." Finally, Gandal claimed that Reliance tortiously interfered with his contractual relations with Blair. Early in the litigation, the district court rejected Reliance, Fritz, and Beath's motion to dismiss Gandal's complaint against them for lack of personal jurisdiction. After discovery, Gandal brought a motion for partial summary judgment on Telemundo's (Blair's corporate successor) liability under the warrant agreement. The defendants below, Reliance, Fritz, Beath, and Telemundo responded with a motion for summary judgment against all of Gandal's claims.

The district court dismissed all of the claims, except for Gandal's contractual claim concerning the $1.50 cash dividend. *See Gandal v. Telemundo Group, Inc.,* 781 F.Supp. 39 (D.D.C.1992). The court granted Gandal's motion for summary judgment on that claim and held Telemundo liable for $1.50 per warrant in damages, even though

Gandal had sought summary judgment as to liability only. The court concluded that the undisputed facts made clear that the $1.50 cash dividend was part of the merger consideration paid to Blair stockholders, and so the warrantholders were entitled to the dividend under the warrant agreement. The court then observed that a warrantholder who let his warrant expire would be entitled to a maximum of $1.50 in damages. The district judge reasoned that if the value of the other assets Gandal would have received upon exercise (the junk bond and the 2.57 shares of ADVO) plus the $1.50 was, throughout the life of the warrant, less than the option price of $36.75, then Gandal suffered no damage from the corporation's failure to pay warrantholders the cash dividend. On the other hand, if the value of the junk bond and the 2.57 ADVO shares alone was ever greater than $36.75, then Gandal should have exercised the option even though the corporation denied owing him the extra $1.50. The district judge described this as Gandal's duty to mitigate damages. The judge concluded that although the exact amount of damages was uncertain Gandal should receive the maximum of $1.50 per warrant. *See id.* at 49.

Gandal appeals the district judge's rejection of his tort theories and his contractual claim to receive the same compensation as the restricted shareholders. He also contends that the district judge should have awarded him specific performance as the remedy for his successful claim. Reliance, Fritz, and Beath, in turn, appeal the rejection of their motion to dismiss for lack of personal jurisdiction. And Telemundo appeals the district judge's liability and damages rulings on Gandal's claim for the cash dividend. We consolidated these appeals and designated Telemundo, Reliance, Fritz, and Beath as the appellants, and Gandal as the appellee. On June 8, 1993, an involuntary bankruptcy petition was filed against Telemundo in the United States Bankruptcy Court for the Southern District of New York. This petition automatically stayed our proceedings as to Telemundo, *see* 11 U.S.C. § 362(a); *Association of St. Croix Condominium Owners v. St. Croix Hotel Corp.,* 682 F.2d 446 (3d Cir.1982), but the automatic stay does not apply to the other defendants, Reliance,

Fritz, and Beath. *See Fortier v. Dona Anna Plaza Partners,* 747 F.2d 1324 (10th Cir. 1984). This opinion, therefore, addresses only Gandal's tort claims against these three defendants, and does not touch any of the issues involving Telemundo.

## II.

Gandal asserts that he was injured both by Reliance's tortious interference with his contract with Blair and by Fritz and Beath's violation of their fiduciary duty to him. Resolution of these claims on the merits would oblige us to decide several difficult issues. The fiduciary duty claim alone would require us to determine whether Delaware or New York law applied, whether board members owe any fiduciary duty to warrantholders, and if such a duty exists, whether Fritz and Beath have breached it. We do not reach the merits of Gandal's tort claims, however, because we conclude that the district court lacked personal jurisdiction over all three tort defendants.

Gandal contends that the district court had personal jurisdiction over the tort defendants under the District of Columbia's long-arm statute, *see* D.C.Code § 13–423(a), upon which the federal district court's personal jurisdiction in a diversity suit can be based. *See, e.g., Gatewood v. Fiat, S.A.,* 617 F.2d 820, 824 (D.C.Cir.1980). He believes that his pursuit of the tort defendants is authorized by section 13–423(a)(4) which states that:

(a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—

    .        .        .        .        .

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

This section, as is apparent, gives the court personal jurisdiction over a claim arising

from an act that occurs outside the District but causes an injury inside the District, provided the alleged tortfeasor can show another "plus factor" that demonstrates activity in the District. The parties dispute whether the tort defendants have sufficient contacts with the District to satisfy this statutory standard. But, as the tort defendants correctly insist, the statute calls for an injury inside the District *before* plus factors even become relevant. *Cf. Gatewood,* 617 F.2d at 825, 827; *Crane v. Carr,* 814 F.2d 758, 761–63 (D.C.Cir.1987).

Gandal claims that his injury occurred in the District only by virtue of his residence here. And Gandal's deposition and pleadings establish that the earliest date on which he resided in the District was December 1, 1986. Not surprisingly, then, he argues that his injury dates from the formal consummation of the merger on December 24, 1986. Whatever significance that date has for Gandal's other claims, his contract rights were not tortiously interfered with by the shareholder vote, which was a mere formality; approval of Reliance's takeover required a simple majority of Blair's common stock, and Reliance held at that date (and had held since July 3, 1986) 60% of the shares. Nor, for the same reasons, did the shareholder vote constitute a breach of fiduciary duty by board members Fritz and Beath.

Gandal suffered his alleged tortious injuries well before December 1, 1986. Any possible tortious interference with Gandal's contract rights took place when Reliance and Blair established the terms of the merger (*e.g.,* the availability of the cash dividend and the decision to purchase restricted shares) in the summer of 1986. Gandal bears the burden of proving that the district court has a basis for asserting personal jurisdiction over the defendants. *See Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 782 (D.C.Cir. 1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984). And Gandal has not pointed to any event occurring after December 1, 1986 that would demonstrate

injury in the District from Reliance's alleged tortious interference with his contract rights.

Gandal alleges that Fritz and Beath violated their fiduciary duty to the warrantholders by approving the favorable treatment of the restricted shares. But the board considered the treatment of those shares during the summer of 1986, before the tender offer was completed. The alleged violation could not have continued beyond the point at which Blair purchased the restricted shares, on September 4, 1986. Even if Gandal's claims are valid, therefore, he suffered his injuries before December 1, 1986 and accordingly was not injured in the District. A plaintiff cannot establish an injury in the District simply by moving here after an injury. *See Leaks v. Ex–Lax, Inc.,* 424 F.Supp. 413, 415–16 (D.D.C.1976). The district court, therefore, lacked personal jurisdiction over the three tort defendants, and erred in failing to dismiss the claims against them for that threshold reason.*

---

* Gandal suggests that the tort defendants invited the district court's error by failing to object to a co-defendant's motion to transfer the case to New York. The tort defendants actually did not object to *either* their co-defendant's motion to transfer or the withdrawal of that motion. In light of the tort defendants' earlier motion to dismiss for lack of personal jurisdiction, their silence at the withdrawal of the co-defendant's motion .to transfer is of no significance.