Morris COFMAN, as general partner of Primus Enterprises, et al., Plaintiffs,

v.

ACTON CORPORATION, et al., Defendants.

Civ. A. No. 89–1754–K.

United States District Court, D. Massachusetts.

July 30, 1991.

Anthony A. Froio, Christopher P. Sullivan, Carolan, Sullivan & Greeley, Boston, Mass., for plaintiffs.

William A. Zucker, Gadsby & Hannah, Boston, Mass., for defendants.

Laura Steinberg, Cynthia M. Clarke, Sullivan & Worcester, Boston, Mass., for Acton Corp.

## OPINION

KEETON, District Judge.

This case turns on the interpretation of eleven Settlement Agreements ("Agreements"), of like terms in all relevant respects. All parties to each Agreement assert as their primary positions that their Agreement is integrated. Nevertheless, they urge contrasting interpretations and, in the alternative, each party asks the court to consider extrinsic evidence to support its proposed answer to the central question at issue in this case. What effect does a reverse stock split, voted by Acton Corporation ("Acton") about a year after the Agreements were made, have upon the amount defendants owe plaintiffs under a payment option exercised by plaintiffs two years later—three years after the Agreements were made? For reasons explained in this Opinion, I conclude that the Agreements did not address an eventuality such as a reverse stock split. In circumstances such as these, a court must determine the meaning of an Agreement, as applied to the question at issue, by examining the parties' mutual expression—the Agreement itself. In the present case, however, I find that I must reach the same result even if taking into account the extrinsic evidence offered at trial. For the reasons explained in this Opinion, judgment will be entered for the defendants.

I.

At a bench trial on June 14, 1991, the court received in evidence the uncontested portions of Plaintiffs' Proposed Findings of Fact ("Uncontested Findings," Docket No. 43, filed May 17, 1991) and adopted them as findings of the court. Additional findings, as well as conclusions of law, are stated and explained in this Opinion.

II.

In or near June, 1986, defendants entered into Agreements with each of the eleven plaintiff partnerships and at that time paid each partnership $10,000. At issue in this case is a provision in Section 2.2 of each of the Agreements regarding the possibility of an additional payment:

the Partnership shall be entitled to receive, upon written demand made within the three years following the execution of the Settlement Agreement (the "Exercise Date"), the following one time payment: the sum of "X" times a multiple of 7,500 where "X" equals the "price" of one share of Acton Corporation's common stock on the Exercise Date less $7.00.

In June, 1987, Acton's shareholders authorized what is described in common jargon as a "one-for-five reverse stock split" of Acton common stock. Described another way, the transaction was one in which for each five shares of their Acton common stock, existing before this date, holders were entitled to one share of common stock existing after this date. The new value in the market on the day after the reverse split was in fact, as would reasonably have been expected, approximately five times the old value.

In May, 1989, each of the partnerships made a written demand for payment under Section 2.2 of the Agreement, alleging that the price of one share of common stock as calculated under the Agreement was $20.54, far in excess of the $7.00 trigger price established by Section 2.2. Defen-

dants rejected the demands for payment, explaining that the reverse stock split, which combined five shares into one, had the effect of raising the trigger price from $7.00 to $35.00. Expressed another way, the substantive effect of the position defendants took, and now take, is that the trigger price remains $7.00 and the price to compare with it is one-fifth of the May 1989 price of Acton stock, because of the five-for-one combination that occurred after the trigger price was set.

### III.

Plaintiffs argue that the plain language of the provision about the " 'price' of one share of Acton Corporation's common stock on the Exercise Date" must be taken to mean the "price" of "one share" as the shares were structured and defined on the "Exercise Date," not the "price" on the "Exercise Date" of "one share of Acton Corporation's common stock" as the common stock was structured and defined when the Agreements were made. Plaintiffs claim to be entitled to payment calculated on the basis that the price of "one share of Acton Corporation's common stock on the Exercise Date" was $20.54, irrespective of the fact that the increase in the price of the stock over its very low value when the Agreements were made (well under $7.00) was caused primarily, if not solely, by the reverse stock split and not by any change in the financial fortunes of Acton. Plaintiff also argues that the defendants accepted the risk of such a reverse stock split by not insisting upon or even negotiating for an antidilution clause in the body of the Agreements.

In contrast, defendants say that the "share of ... common stock" referred to in the Agreements plainly means the form of common stock in existence when the Agreements were signed. Since that form of common stock is no longer in existence, the argument goes, one share of today's stock must be viewed as equivalent to five old shares. Defendants argue that, in determining defendants' payment obligation under Section 2.2, the trigger price must be adjusted from $7.00 to $35.00. As noted in Part II, another way of expressing a con-

tention having the same substantive effect is to say that the May 1989 price of $20.54 must be divided by five, yielding $4.11, which is below the trigger price of $7.00.

### IV.

Examining some basic ideas about "expression" and "meaning" may help us understand and interpret the documents that the contracting parties called their "Settlement Agreements."

Consider, first, an expression of a single author. What is the "meaning" of the author's "expression"? The question has its own imprecision. Does it ask a "subjective" question—a state-of-mind question about what the author intended the meaning to be, regardless of how clearly or unclearly that meaning was expressed? Or, does it ask an "objective" question—what did the author's expression objectively manifest as the author's meaning, or as the meaning of the expression itself? Consider additional nuances of the question when two or more authors make a joint or—as we more commonly say about contracts—"mutual" expression. Does "meaning" refer to a meaning intended subjectively by all the authors, in which case there is no "meaning" if there was no "meeting of the minds"? Or, is meaning to be determined objectively—by determining objectively the manifested meaning?

Analogies from communications outside ordinary legal discourse may be useful. What was, or is, the "meaning" of Rodin's *The Inner Voice?* Of *Venus de Milo* ? What was, or is, the meaning intended by each sculptor? Was there, or is there, a manifested meaning?

Neither of these works of art now has arms. *Venus de Milo* shows clear signs of alteration after it left the control of the artist. *The Inner Voice*, on the other hand, appears intact. Thus, from examination of the form and structure of each work itself—entirely without consideration of extrinsic evidence—we may infer that one, but not the other, is the sculptor's complete expression.

A piece of sculpture that is merely a torso, or even a classic statue with arms or legs missing, may be nevertheless quite complete as a design, though from a physiological point of view there is evidently something missing. Thus Rodin did not destroy the completeness of his statue *The Inner Voice*—later used for the Victor Hugo monument—when he left off the arms because arms, he said, imply action, and action is the enemy of meditation.

M. Beardsley, *Aesthetics: Problems in the Philosophy of Criticism* 193 (1958). *See also* J. Toran, *'Tis a Gift to Be Simple: Aesthetics and Procedural Reform*, 89 Mich.L.Rev. 352, 360–61 and n. 35 (1990). The point remains valid, even if we credit a somewhat different historical account than that implicit in Rodin's having "left off the arms"—that, instead, as described by Albert E. Elsen, *The Inner Voice* is one state of a figure of which Rodin fashioned many, with arms in differing positions, and in this state Rodin struck the arms before releasing the sculpture we know as *The Inner Voice* because they interfered with "the sense of the woman's inner listening." *See* A. Elsen, *In Rodin's Studio* 169 (1980). Professor Toran also quotes Beardsley for the proposition that "[t]o say that an object has completeness 'is to say that it appears to require, or call upon, nothing outside itself; it has all that it needs; it is all there.'" Toran at 360–61, *quoting* Beardsley at 192. *The Inner Voice* is "complete" in this sense. *Venus de Milo*, as we may observe it today, is not.

### V.

Each Agreement in this case is complete in the same sense that *The Inner Voice* is complete.

Regardless of whether a trial court's determination of completeness in this sense is viewed as a "conclusion" to be reviewed nondeferentially by a higher court (as I believe it to be), or instead a "finding," the determination is in this instance supported by an examination of the document as a whole. The determination of completeness is reinforced by an "integration clause" included in Section 11 of each Agreement.

Such a clause is said to create a presumption that the parties intended the contract to be the complete statement of their agreement. *SAPC, Inc. v. Lotus Development Corp.*, 921 F.2d 360, 362 (1st Cir. 1990).

An expression may be complete in the sense *The Inner Voice* illustrates and yet be ambiguous. Indeed, human limitations make it inevitable that every expression—every artistic work, every written document, every contract, every statute, every judicial opinion—will be less than complete in a thoroughly comprehensive sense. Ambiguity will remain about some matters that might have been addressed and were not.

■ Ambiguity, however, is not an all or nothing matter. Demonstrating ambiguity in one respect does not prove ambiguity in another. Before deciding whether the parol evidence rule (or the rule of completeness or integration) permits or prohibits consideration of extrinsic evidence in aid of resolving a particular dispute, a court must first, at a minimum, determine whether the mutual expression of the parties is ambiguous on the very point at issue.

■ Turning to the interpretation of the Agreements, I conclude that neither the reading of the Agreements suggested by the plaintiffs nor that suggested by the defendants is precisely correct. Each party asserts that the "plain language" bears no other interpretation than that the party advances as its contention. The truth is, instead, that the language used by the parties does not explicitly address the question at issue. One who reads each Agreement entirely, with the most thorough care, is driven to conclude that in drafting their Agreement the parties never specifically addressed the possibility of either a future stock split by Acton or, as is the case here, a reverse stock split. Whatever may have been the reasons for the parties' failure to address stock splits and reverse stock splits, the fact that they did fail to do so is manifest. Not a single word or phrase explicitly about stock splits or reverse

stock splits appears anywhere in the Agreements.

Even in integrated agreements, contractual language "is not self-interpreting—no form of words is....", *Antonellis v. Northgate Construction Corp.*, 362 Mass. 847, 851, 291 N.E.2d 626, 628 (1973). When a court reads a contract with the purpose of understanding and "making sense" of it, this is not "tantamount to re-writing it." *Fay, Spofford & Thorndike, Inc. v. Massachusetts Port Auth.*, 7 Mass.App.Ct. 336, 342, 387 N.E.2d 206, 210 (1979). Instead, the court applies

> the principle that a literal interpretation of a word or phrase may be qualified by the context in which it appears, by the general purpose manifested by the entire contract, and by the circumstances existing at the time of execution.

*Id.*

When a document contains no internal indicia that the parties manifested an agreement with each other about an issue, we may need to do some reality testing of litigation positions. One way of doing so, suggested by Holmes, is to wash each party's current contention about meaning in "cynical acid." For example, consider how each assertion now made would have fared during negotiations if it had been explicitly stated then. Make this judgment as best we can from the evidence available to us in the content and structure of the parties' mutual expression. Heed the inner voice of the expression itself.

Plaintiffs argue that the omission of antidilution language allocates the risk of a reverse stock split to defendants. If that is so, then the inference is likewise compelling that this omission allocates to the plaintiffs the risk of a regular stock split. Such a reading would allow defendants, should market conditions cause the price to rise near the trigger price, unilaterally to deprive the plaintiffs of their expected benefits under the Agreements by splitting the stock. Although plaintiffs gallantly assured the court in oral argument that this would be their position if such an eventuality had occurred, the idea that plaintiffs would willingly have entered into an agreement that allocated such a unilateral right to defendants utterly fails reality testing. Given the joint expression the parties agreed upon, it defies common sense to infer that plaintiffs, if focusing upon this issue during negotiations, would have agreed to answering it explicitly in the way the plaintiffs now contend.

In searching for the parties' manifested meaning a court is both guided and constrained by the form, structure, sense, and internally manifested design of the contract itself—the *mutual expression of the parties*. The answer the decisionmaker is seeking is not the answer the decisionmaker would think best if left entire freedom of choice. It is fundamental to the integrity of the decisionmaking process that the decisionmaker accept both the guidance and the constraints to be found in the parties' own mutual expression of their agreement.

## VI.

The conclusion I have reached as to the meaning of the Agreements themselves in relation to the issue in dispute is not contradicted by the extrinsic evidence offered by the parties in this case. Rather, as factfinder, I find that the extrinsic evidence proffered by the plaintiffs, either taken alone or together with the extrinsic evidence proffered by the defendants, reinforces this meaning. For this reason, all objections to evidence on which I reserved ruling at trial are moot.

## VII.

In summary, it would be as surely a departure from manifested meaning to add to the Agreements in this case a windfall compensation provision contingent on a stock split or reverse stock split as to design a mechanical device that would attach flailing arms to *The Inner Voice.*

Judgment will be entered for the defendants.