[715 NYS2d 29]

MARVIN M. REISS et al., Appellants, v FINANCIAL PERFORMANCE CORPORATION, Respondent.

First Department, November 2, 2000

**APPEARANCES OF COUNSEL**

*Joseph M. Weitzman* for appellants.

*Howard Grun* of counsel (*Kaufman, Friedman Plotnicki & Grun, L. L. P.,* attorneys), for respondent.

**OPINION OF THE COURT**

FRIEDMAN, J.

Where a warrant to purchase stock is silent as to the effect of a reverse stock split on a warrant holder's right to purchase shares of stock, must the warrant be deemed, after such a split, to reflect a proportional change in both the number of shares that may be purchased and the price of each share? We conclude that, in the absence of any evidence that the parties to a warrant contemplated otherwise, the warrant holder, because of the reverse stock split, is limited to purchasing shares proportionally adjusted as to both number and price.

This appeal arises from the authorization given on October 8, 1993, by the Board of Directors of defendant Financial Performance Corporation (Financial), to issue a warrant[1] to Rebot Corporation, permitting Rebot to purchase 1,198,904 shares of Financial's common stock at a price of 10 cents per share. The warrant was executed in consideration of a $187,328.79 loan that Financial was unable to repay to Rebot. On November 11, 1993, Financial's Board also gave authorization to issue a warrant to Marvin Reiss (who was, at the time, a member of Financial's Board and apparently Rebot's President), permitting him to purchase 500,000 shares of stock at 10 cents per share. This warrant was issued as an honorarium payment for

---

1. A warrant is a contractual obligation " 'entitling the owner to buy a specified amount of stock at a specified time(s) for a specified price' " (*Gandal v Telemundo Group,* 781 F Supp 39, 41, n 1 [*revd on other grounds* 997 F2d 1561], quoting Black's Law Dictionary 1422 [5th ed 1979]; 19 Fletcher, Cyclopedia of Corporations § 2:60, at 83 [perm ed]).

Reiss' services on Financial's Board. Both the Rebot and Reiss warrants provided that the right to purchase stock would extend for a period of five years until September 30, 1998 and August 31, 1998, respectively.

The actual warrants were not physically delivered to either Rebot or Reiss (collectively referred to as plaintiffs) until November 21, 1995, approximately two years after the warrants were originally authorized. However, as Reiss was a member of Financial's Board of Directors and was also the President of Rebot, it is clear that plaintiffs were aware that the warrants had been previously authorized. Moreover, it is undisputed that, from the time that the warrants were authorized, Financial listed them on its books and records, as well as its filings with the Securities and Exchange Commission (SEC).

In August of 1996, at an annual meeting, Financial's shareholders approved a one-for-five reverse stock split. As a result, each stockholder owned one fifth the original number of shares, with each share representing that amount of ownership previously represented by five shares of stock (see, 19 Fletcher, Cyclopedia of Corporations § 3:48, at 117-118 [perm ed]). Financial's books and records, as well as its SEC filings, all reflected the change in the number of shares. The conversion of the outstanding warrants was also noted. Thus, Rebot was listed as being entitled to purchase 239,781 shares of stock (one fifth of 1,198,904) and Reiss was listed as being entitled to purchase 100,000 shares of stock (one fifth of 500,000). The exercise price of each share of stock was also converted to reflect the reverse stock split such that each share would now be exercisable at 50 cents instead of 10 cents.

Thereafter, on April 28, 1998, plaintiffs sought to partially exercise their warrants. In seeking to do so, plaintiffs asserted that they were entitled to purchase shares of Financial in accordance with the literal language of the warrants without adjustment for the reverse stock split. Financial, on the other hand, asserted that any right to purchase stock under the warrants had to be proportionally adjusted to reflect the reverse stock split.

The line in the sand having been drawn, plaintiffs commenced the instant action seeking a judgment (a) declaring that Rebot and Reiss remained entitled to purchase 1,198,904 and 500,000 shares of stock, respectively, at 10 cents per share, and (b) reforming the warrants to provide, respectively, for a new expiration date of October 31, 2000 and November 30, 2000. This latter cause of action was premised on the claim

that, since there had been a two-year delay in physically delivering the warrants, the exercise period of the warrants should be concomitantly extended an additional two years. Plaintiffs also sought, via orders to show cause, to stay the expiration date of the warrants while the action was pending and disqualify Financial's attorney. Financial cross-moved for dismissal of the action pursuant to CPLR 3211 (a) (1) and (7).

Supreme Court granted Financial's cross motion and dismissed the action, finding that the warrants, by their specific terms, required an adjustment in the event of a reverse stock split.[2] It appears that, in reaching this conclusion, the court relied upon certain warrant agreements in the record that contained express language regarding such a scenario. The court also denied as moot plaintiffs' claims that there was a basis for reforming the expiration date of the warrants or for disqualifying Financial's counsel.

Plaintiffs moved for reargument, pointing out that the warrant agreements the court relied upon did not relate to their warrants. Supreme Court granted reargument, and upon reargument, adhered to its prior decision. The court also imposed sanctions against plaintiffs.

We note at the outset that, contrary to the conclusion reached by Supreme Court, the warrants at issue failed to contain any contractual language dealing with the eventuality of a reverse stock split. It is apparent that the court improperly relied upon certain warrant agreements in the record that, although containing relevant language, were wholly unrelated to the warrants at issue. Hence, to the extent that the court relied upon such unrelated agreements, its reasoning was clearly erroneous. Nevertheless, for the reasons discussed below, we agree that plaintiffs' complaint should be dismissed. We do not believe, however, that the imposition of sanctions was warranted as plaintiffs' conduct was completely appropriate.

Analysis of the issue presented must begin with a detailed examination of *Cofman v Acton Corp.* (958 F2d 494 [1st Cir 1992]), a case bearing striking similarities to the instant case.

---

2. We note that, although the cross motion for dismissal was brought pursuant to CPLR 3211 (a) (1) and (7) and could properly be resolved under these paragraphs, it was, and is, equally appropriate to resolve the cross motion as having been a request for summary judgment pursuant to CPLR 3212. Significantly, all parties laid bare their proof and deliberately charted a summary judgment course (*see, Mihlovan v Grozavu*, 72 NY2d 506, 508; *Four Seasons Hotels v Vinnik*, 127 AD2d 310, 320). Moreover, in a reply affidavit dated July 1, 1998, plaintiff Reiss specifically recognized that the court might treat the cross motion as one seeking summary judgment.

In *Cofman*, plaintiffs were engaged in settlement negotiations of a prior suit with the defendant corporation. Plaintiffs were willing to settle the earlier action for $120,000 but sought an added "sweetener." The parties ultimately agreed upon a "sweetener," the value of which depended upon the price of a share of defendant corporation's stock. The price of a share was to be determined as follows: " 'The "price" on the Exercise Date shall be equal to the average closing price of one share of the common stock of [the corporation] on the American Stock Exchange for any period * * * consisting of thirty (30) consecutive trading days prior to the Exercise Date.' " (*Supra,* at 495.)

About one year later, defendant corporation executed a reverse stock split that resulted in each stockholder owning one fifth the original number of shares, with a concomitant increase in value for the new shares. A letter was then sent to the plaintiffs advising them of the reverse stock split and indicating that their settlement agreement would be deemed modified to reflect the split. The plaintiffs disagreed, contending that their agreement did not provide for any adjustment based upon changes in the structure of the stock. Since the parties could not agree on the value of the "sweetener," litigation ensued.

At a trial focused on this issue, the plaintiffs argued that the price of one share of common stock must be taken to mean the price of one share as the shares were structured on the exercise date, not the price of one share of the defendant corporation's common stock as the stock was structured when the agreements were made (*Cofman v Acton Corp.,* 768 F Supp 392, 394). The plaintiffs also argued that the corporation accepted the risk of a reverse stock split by not insisting upon or even negotiating for a provision to deal with this eventuality (*id.*). The corporation asserted that the share of common stock referred to in the agreement plainly meant the form of common stock in existence when the agreements were signed, which required recognition of the reverse split to ascertain its value (*id.*, at 394).

The trial court, finding that the parties had not considered the possibility of either a stock split or reverse stock split, held that the omission was an ambiguity in the agreement, and "resolved [the ambiguity] by concluding that the reasonable provision would have been that stock splits would have no effect" (958 F2d 494, 496, *supra*). The trial court thus concluded that the price of a share of stock, for purposes of the agreement, meant the form of a share at the time of the execution of

the agreement. This approach required a proportional modification accounting for the reverse stock split.

On appeal the Court of Appeals for the First Circuit affirmed. In doing so, the court began with the observation that plaintiffs entered into the agreement as a "sweetener" to the their settlement, i.e., to provide them with the possibility of additional funds if the corporation's business improved (*id.*, at 495). The court next observed that, if plaintiffs' construction of the agreement were accepted, an absurd result would follow. In this regard, if the agreement were read literally, as the plaintiffs urged, the corporation could have eviscerated any possibility of the plaintiffs benefitting from the agreement by simply declaring a stock split, as opposed to a reverse stock split (*id.*, at 497). Stated otherwise, the corporation would be able to dilute the value of its stock to such an extent that the plaintiffs' "sweetener" was valueless. This being so:

> " 'It defies common sense' that [plaintiffs] would have agreed that [the corporation] could effectively escape the specified consequences of a rising market price by increasing the number of shares. And if [plaintiffs] would not suffer from any increas[e in the number of shares], it would follow, since a contract must be construed consistently * * * [the corporation] should not suffer from any decreas[e in the number of shares]" (*id.*).

We find *Cofman* to be dispositive of the issue presented here by force of its logic, albeit not as a matter of stare decisis. In this connection, to accept plaintiffs' interpretation of the contract, namely, that the warrants did not allow for a proportional adjustment to reflect a reverse stock split, would necessarily mean that the warrants also did not allow for a proportional adjustment if there were a stock split. Flowing from that reasoning is the observation that Financial, like the corporation in *Cofman,* could have eviscerated the value of plaintiffs' warrants and escaped its contractual obligations by simply declaring a massive stock split instead of a reverse stock split. Here, as in *Cofman,* it defies all bounds of common sense to believe that plaintiffs could have ever intended such an outcome. This is especially so since, at least with respect to the Rebot warrant, the very purpose of the warrant was to provide satisfaction of a debt that Financial had been unable to pay. Rebot certainly did not intend to enter into an agreement that would permit Financial, if it so chose, to unilaterally extinguish its $187,328.79 debt. We therefore conclude that,

just as plaintiffs should not suffer from the possibility of dilution of their warrants resulting from a stock split, so too Financial should not suffer from the consolidation of its shares resulting from a declaration of a reverse stock split (*Cofman v Acton Corp.*, *supra*; *cf.*, Restatement [Second] of Contracts § 204, comment *c* [1981] [a term can be supplied by logical deduction from the agreed terms and the circumstances of the making of the contract]). Any other conclusion would ignore the plain intent of the parties in issuing and receiving the subject warrants.[3]

Notwithstanding *Cofman (supra)*, plaintiffs and the dissent assert that a literalistic approach to the interpretation of the warrants is compelled as a matter of law. We cannot agree. Surely a court is not required to disregard common sense and slavishly bow to the written word where to do so would plainly ignore the true intentions of the parties in the making of a contract. Such formalistic literalism serves no function but to contravene the essence of proper contract interpretation, which, of course, is to enforce a contract in accordance with the true expectations of the parties in light of the circumstances existing at the time of the formation of the contract (*see, Aron v Gillman*, 309 NY 157, 163; *O'Neil Supply Co. v Petroleum Heat & Power Co.*, 280 NY 50, 55; *see generally,* Farnsworth, *Disputes Over Omission in Contracts,* 68 Colum L Rev 860). We point out that no one makes the claim that there is any other evidence to be offered on the issue of the parties' expectations, other than what has been presented on this appeal. Nor does anyone claim that a trial is necessary to resolve any ambiguity.[4]

In any event, to the extent that the warrants may be viewed as not containing an implicit requirement for the proportional adjustment of Financial's stock upon a split or reverse split, it means that the parties omitted what is undeniably an essential

---

**3.** We need not decide whether the same rule should apply to publicly tradeable securities (*see, Cofman v Acton Corp.*, 958 F2d 494, 497, n 5, *supra*; *see also, Parkinson v West End St. Ry. Co.*, 173 Mass 446, 53 NE 891). Suffice it to say that plaintiffs concede (and in fact advocate) that the warrants at issue here were merely private contracts that, by their terms, could not be transferred or publicly traded.

**4.** Although certainly not dispositive, plaintiffs themselves seemingly recognized the lack of logic inherent in their position. Thus, at oral argument plaintiffs were forced to concede that, had there been a stock split as opposed to a reverse stock split, they would have asserted a contrary position to that which they presently advocate and would have argued that the parties did not intend that Financial be able to dilute its stock to the point of rendering the warrants valueless.

term of the agreement. Contrary to the dissent's contention, a provision dealing with this eventuality is essential since it fundamentally affects both the number of shares that may be purchased and the price to be paid. In a circumstance where an essential term is omitted, section 204 of the Restatement (Second) of Contracts is instructive. That section provides:

> "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."

Here, following the Restatement approach, the only reasonable term would be the one consistent with the self-evident expectations of the parties when the warrants were executed, namely, a term requiring a proportional adjustment of both the number of shares that may be purchased and their price.[5]

Turning to plaintiffs' reliance on *Sanders v Wang* (1999 Del Ch LEXIS 203, 1999 WL 1044880 [Del Ch Ct, Nov. 8, 1999]), a decision of the Chancery Court of New Castle County, Delaware, we find that this decision does not address the issue presented here and certainly does not require us to reach the conclusion advocated by plaintiffs. In *Sanders*, a corporation implemented a key employee stock ownership plan. The plan permitted the corporation " 'to grant up to 6,000,000 shares of Common Stock' " (1999 Del Ch LEXIS 203, at * 5, 1999 WL 1044880, at * 2) to enumerated executives assuming that certain price targets in the corporation's stock price were achieved. In determining whether the price targets had been met, the plan specifically provided that the corporation's compensation committee could adjust the stock price to account for any stock splits. However, the plan did not contain a

---

5. Although plaintiffs' brief on this appeal alleges that plaintiff Reiss specifically advised defendant that he would not accept warrants containing a provision to deal with a reverse stock split, this allegation is contradicted by the record. The affidavit of plaintiff Reiss submitted at Supreme Court, and upon which the brief apparently relies, merely indicated that Reiss would not accept warrants containing language that the warrants were subject to a separate agreement. Contrary to the conclusion reached by the dissent, this vague allegation hardly supports the view that the parties contemplated the eventuality of a stock split and, significantly, even though this was the central issue before Supreme Court, Reiss did not aver that the subject of stock splits was ever contemplated. At best, Reiss' allegation was an assertion that the parties intended the warrants to represent the full understanding of the parties. However, even if the parties intended the warrants to embody their full understanding, the fact remains that the warrants fail to contain any overt guidance on the issue of stock splits.

similar provision allowing the committee to adjust the number of shares granted to account for any stock splits. When the conditions ripened for a grant of stock, the compensation committee took into consideration intervening stock splits, adjusted the 6,000,000 shares to account for the splits, and granted the specified executives 20.25 million shares of stock. The *Sanders* court held that the corporation's action was unauthorized and that any grant of stock was limited by the 6,000,000 share ceiling (*Sanders v Wang*, 1999 Del Ch LEXIS 203, 1999 WL 1044880, *supra*).

Plaintiffs read *Sanders* for the broad proposition that, in any and all cases, where a contract fails to provide specific authorization for an adjustment of shares to reflect a stock split or reverse stock split, such an adjustment is unauthorized. Such a broad reading of *Sanders* is not, however, supportable.

As indicated, the contract in *Sanders* contained a provision specifically authorizing the consideration of stock splits with reference to determining price targets. Pointing to this fact, the *Sanders* court emphasized the conspicuous absence of a similar provision authorizing the consideration of stock splits with regard to the grant of shares. What becomes evident is that *Sanders* was addressing itself only to a situation where the contract explicitly contains a reference to stock splits in one section but omits such a reference in another. The court, therefore, was merely applying the maxim, *expressio unius est exclusio alterius*, meaning, the expression of one thing implies the exclusion of the other (Black's Law Dictionary 602 [7th ed])—it was not interpreting a contract that completely omitted any reference to stock splits, as is the case here. Thus, *Sanders* is of little, if any, analytical utility in determining the appeal before this Court. In any event, to the extent that *Sanders* may be read in the manner that plaintiffs suggest, we decline to follow it as we find the First Circuit's decision in *Cofman* (*supra*) to be persuasive.

The decision of the Iowa Supreme Court in *Smith v Stowell* (256 Iowa 165, 125 NW2d 795), which is relied upon by the dissent, is similarly inapposite. In *Smith*, plaintiffs sold 10 shares of bank stock to defendant for $290 a share, reserving an option to repurchase the shares in the future for $305 a share, at a total cost of $3,050. Several years later, the bank issued a stock dividend of three shares of stock for each share held. As a result of the stock dividend, defendant became the owner of 40 shares of stock. Plaintiffs, seeking to exercise their option, asserted that they were entitled to purchase all 40 shares at

the price of $3,050. Plaintiffs apparently argued that this result was required because defendant held the same proportional interest in the total outstanding stock both before and after the stock dividend. The court rejected plaintiffs' argument.

In reaching its conclusion, the court pointed out that the option agreement specifically provided that plaintiffs were only entitled to repurchase the very 10 shares they had sold to defendant (*id.*, 256 Iowa, at 169, 125 NW2d, at 797). This being so, there could be no interpretational basis entitling plaintiffs to purchase stock subsequently acquired by defendant as a result of a stock dividend. *Smith*, therefore, provides no guidance in this case since it involved an agreement that, in unequivocal terms, specifically limited the plaintiffs' right to purchase stock.

Two further observations regarding *Smith* are appropriate. First, it appears that *Smith* is no longer the law in Iowa (*see*, *Lamp v American Prosthetics*, 379 NW2d 909, 910 [Iowa]). Second, *Smith* involved a stock dividend, not a stock split. There is, therefore, a serious question as to whether the reasoning of *Smith* could, under any circumstances, have any applicability here (*see generally*, *Matter of Fosdick*, 4 NY2d 646, 653 [discussing the legal distinction between stock splits and dividends]).

Finally, as to plaintiffs' claim for reformation of the expiration dates of the warrants, we find such claims to be without merit (*see generally*, *Nash v Kornblum*, 12 NY2d 42; *see also*, *Barclay Arms v Barclay Arms Assocs.*, 74 NY2d 644). We note in this regard that, notwithstanding the late delivery of the actual warrants, plaintiffs were at all times aware of their existence and never sought to compel their physical delivery. Nor is there any indication, or even an allegation, that plaintiffs desired to exercise their right to purchase stock before the time the warrants were physically delivered. Moreover, plaintiffs present no foundation for their vague allegations of fraud and mutual mistake.

We have examined plaintiffs' remaining contentions and find them to be unavailing.

Accordingly, the order of the Supreme Court, New York County (Charles Ramos, J.), entered September 22, 1998, which, *inter alia*, granted defendant's cross motion to dismiss plaintiffs' complaint, should be modified, on the law, to the extent of issuing a declaration in defendant's favor, and otherwise affirmed, without costs. Order, same court and Justice, entered December 18, 1998, which granted plaintiffs'

motion to reargue, and upon reargument, imposed sanctions on plaintiffs, and otherwise adhered to the September 22, 1998 order, should be modified, on the law and the facts, to the extent of vacating the sanctions imposed, and otherwise affirmed, without costs.

SAXE, J. (dissenting in part). The law of contracts offers relief from a hard bargain only upon a showing of fraud, duress, mistake, misrepresentation, illegality, impossibility of performance or unconscionability. But, when none of those grounds has been established, and the terms of the agreement under consideration are clearly set forth within the four corners of the document, courts should not alter those terms, even where the alteration achieves a more equitable result. As Judge Cardozo noted:

> "A contract is made. Performance is burdensome and perhaps oppressive. If we were to consider only the individual instance, we might be ready to release the promisor. We look beyond the particular to the universal, and shape our judgment in obedience to the fundamental interest of society that contracts shall be fulfilled." (Cardozo, The Nature of the Judicial Process, at 139-140 [Yale Univ Press].)

Stock warrants[1] issued by defendant Corporation gave plaintiffs the right to purchase a specified number of shares at a specified price within a defined period. The conflict here arises because a one-for-five reverse stock split,[2] which took place prior to plaintiffs' exercise of the warrants, created a change in the per share value of the Corporation's stock. We are asked to determine whether the stock warrants were actually subject to an implied condition or limitation that the number and price of shares to which the warrants applied would be automatically adjusted in the event of a change in the character of the corporate stock, due to a stock split.

---

1. Stock purchase warrants are defined as " '[a] certificate entitling the owner to buy a specified amount of stock at a specified time(s) for a specified price' " (*Gandal v Telemundo Group*, 781 F Supp 39, 41, n 1 [*revd on other grounds* 997 F2d 1561], quoting Black's Law Dictionary 1422 [5th ed 1979] [citing *Miller v General Outdoor Adv. Co.*, 223 F Supp 790, 794, *revd on other grounds* 337 F2d 944]).

2. "A reverse stock split occurs when the number of outstanding shares is reduced so that, for example, each ten shares will become only one share" (19 Fletcher, Cyclopedia of Corporations § 3:48, at 117 [perm ed]).

The specific facts are as follows: defendant, Financial Performance Corporation, which was initially incorporated in 1984, began trading on the Nasdaq market in January 1987, but was de-listed in July 1989 because it failed to satisfy Nasdaq's minimum capital requirements. Between 1989 and 1993, the Corporation sought to raise working capital through private debt and equity issuances. Plaintiff Marvin M. Reiss was at that time a director of the Corporation, and through plaintiff Rebot Corporation (Rebot), a private corporation wholly owned by Reiss, he loaned it an aggregate of $187,328.79, receiving promissory notes in return.

On September 30, 1993, as partial repayment of these loans, the Corporation issued to Rebot stock warrants entitling Rebot to purchase 1,198,904 shares of common stock of the Corporation for $.10 per share, until September 30, 1998. On November 11, 1993, Reiss also received warrants entitling him to purchase 500,000 shares of common stock at $.10 per share until August 31, 1998, in recognition of his services to respondent Corporation as a director.

The 1993 Form 10-KSB Annual Report filed by defendant Corporation with the Securities and Exchange Commission (SEC) reported the existence of the foregoing stock warrants, along with stock warrants issued in the same period to other investors who had loaned money to the Corporation, including Robert S. Trump. Also included with the exhibits to this 10-KSB Annual Report was a Warrant Agreement dated September 1, 1993 between the Corporation and Mr. Trump, containing terms defining, *inter alia*, the rights of the warrant holder in the event of a consolidation or reclassification of shares.

The warrants themselves were not actually forwarded to plaintiffs until 1995, under a cover letter dated November 21, 1995 which stated, in pertinent part:

> "The enclosed warrant certificate is subject to the terms and conditions of a warrant agreement dated even date therewith on file at the Company's offices located at 335 Madison Avenue, New York, New York 10017,"

and requested that Mr. Reiss sign the letter at the bottom to "acknowledge receipt." However, nothing in the record indicates the existence of any such "warrant agreement dated even date." Mr. Reiss did not sign the acknowledgment at the bottom of the cover letter. Indeed, defendant has never asserted that any warrant agreement was actually issued setting

forth terms and conditions specifically concerning the Reiss and Rebot warrants. Rather, defendant takes the position that the Trump Warrant Agreement, which was included as one of the exhibits to the 1993 Form 10-KSB filed with the SEC, "contains the same substantive provisions which are included in the warrant agreements historically used in connection with all of the warrants issued by the Defendant to date," thus implying that these provisions automatically applied to all warrants.

Defendant has suggested that the issuance of stock warrants without simultaneous issuance of any warrant agreement referable to them was the result of a failure of defendant's former counsel. In a series of letters between the Corporation's former counsel and its current counsel it is asserted that the Corporation's former counsel was responsible for preparing 10 separate stock warrants issued in September and November 1993 (including plaintiffs'), and that when the Corporation dismissed its former counsel in April 1994, he retained all the existing paperwork in his possession until his dispute with the Corporation was settled in February 1995. Current counsel for the Corporation asserted in his letter of June 20, 1995, that upon review of the warrant documentation for these 10 1993 stock warrants, it was discovered that former counsel had "failed to prepare and submit to the Board of Directors for approval any form of warrant agreement pursuant to which the warrant certificates were to have been issued."

Plaintiff Marvin Reiss offers an alternative explanation for the issuance of the stock warrants without a related warrant agreement: he asserts that the non-issuance of a related warrant agreement was intentional, in that

> "During the arduous negotiations, in return for the conversion of almost $200,000 of loans, I specifically refused to accept FPC warrants if the 'Warrant Agreement' language was included. Again, in return for almost $200,000 of my money, the defendant corporation acquiesced."

Additionally, Reiss emphasizes that the stock warrants issued to him contain none of the standard language specifically subjecting the warrant to the terms and conditions of a warrant agreement, in contrast to the stock warrant issued to Robert S. Trump.

The Corporation subsequently effectuated the one-for-five reverse stock split in September 1996, following its approval by

the shareholders at an annual meeting held in August 1996. This reverse stock split was disclosed in the 1996 10-KSB filed with the SEC in January 1997, which report included the conclusion that the 1993 warrants issued to Rebot and Reiss were converted on defendant's books from 1,198,904 to 239,781, and from 500,000 to 100,000, respectively, while the price per share was increased to $.50 per share.

By letter dated October 9, 1997, plaintiffs' attorney wrote to William F. Finley, President of the Corporation, asking for written confirmation of the Reiss and Rebot warrants in the amounts originally issued, i.e., 500,000 issued to Reiss and 1,198,904 issued to Rebot. The letter further asked for "any documents in any way impacting upon or adversely affecting the number of warrants and/or the number of shares which can be purchased upon the exercise of said warrants."·

In response, the Corporation explained its position that the 1996 reverse stock split reduced the number of shares to which plaintiffs were entitled.

Subsequently, on or about February 9, 1998, plaintiffs' counsel again wrote to the Corporation's counsel and requested a copy of the warrant agreement which purportedly was applicable to the Reiss and Rebot warrants as indicated in the letter of November 21, 1995. By letter dated May 6, 1998, the Corporation stated that:

> "As you and your clients have previously been advised, the September 1993 and November 1993 warrants were issued by the Company subject to the terms and conditions of warrant agreements dated even date therewith on file at the Company's offices, which is customary corporate practice."

Plaintiffs commenced this action seeking, *inter alia*, a declaration of their rights under the warrants. In addition to declaratory relief, plaintiffs sought reformation of the warrants on the ground of fraud and/or mutual mistake, and an extension of the exercise period due to the Corporation's two-year delay in forwarding the documents to plaintiffs. Simultaneously, plaintiffs moved to stay expiration of the exercise period· until a determination of those rights could be made. Plaintiffs additionally moved to disqualify defendant's counsel pursuant to Code of Professional Responsibility DR 5-108 (a) (1) and DR 5-102 (a) (22 NYCRR 1200.27 [a] [i]; 1200.21 [a]). The Corporation cross-moved to dismiss the complaint pursuant to CPLR 3211 (a) (7).

The IAS Court granted the Corporation's cross motion to dismiss the complaint, remarking that at the time of issuance, "by their written terms the warrants at issue permit and require appropriate adjustments in number and price in the event of a duly authorized reverse split." It also noted that physical delivery of the warrants was well in advance of the 1996 reverse split, that plaintiffs failed to demand delivery of the warrants between 1993 and 1995, and that plaintiff Reiss was a director of the Corporation at the time the warrants were issued, and could not assert that he was unaware of their precise terms and conditions.

Plaintiffs moved to reargue in an attempt to demonstrate that the IAS Court had erred in concluding that the warrants, by their terms, were subject to the reverse stock split, when in fact they contained no language incorporating or making reference to any additional terms and conditions. Plaintiffs particularly emphasized that the language in the Trump warrants was different from the language in the Reiss and Rebot warrants so that no direct correlation existed between the respective transactions. Plaintiffs also pointed out that at the time they were issued in 1993, only "forms" of the warrants were prepared, without a corresponding agreement.

The IAS Court granted reargument, and upon reargument, granted the Corporation's motion for sanctions, explaining that the terms which impose the adjustment were contained in SEC filings and the letters which accompanied the issuance of the warrants at issue. It concluded that plaintiffs' claim was frivolous, and granted defendant's application for sanctions.

I would reverse the dismissal of the cause of action for declaratory relief. The warrants, by their clear terms, gave plaintiffs an absolute, unconditioned right to purchase the specified number of shares for the price set forth in the warrants, and nothing in the warrants permits their terms to be altered by a reverse stock split. Reversal of the motion court's award of sanctions would logically follow, although in any case the sanctions cannot stand, since the court's characterization of the plaintiffs' reargument motion as frivolous was erroneous and unsupported.

Contrary to the conclusion reached by the IAS Court, defendant failed to offer any evidence that warrant agreements existed in 1993 which were applicable or referable to plaintiffs' warrants, or that any agreements that would govern the terms and conditions of the warrants nunc pro tunc subsequently came into existence, or that plaintiffs were by any other means

bound by any additional terms and conditions beyond the terms of the warrants themselves.

Stock warrants are generally issued in conjunction with a warrant agreement, which agreement sets forth terms and conditions to which the warrant is subject (*see*, *e.g.*, *Gandal v Telemundo Group*, 781 F Supp 39, *supra*; *Brucker v Thyssen-Bornemisza Europe*, 424 F Supp 679; *Pomierski v Grace & Co.*, 282 F Supp 385). Indeed, as counsel for defendant asserted in their letter of May 6, 1998, it was their "customary corporate practice" to issue a warrant agreement simultaneously with a stock warrant, and to keep that agreement on file at the corporate office. Nevertheless, no such warrant agreement was issued here.

The warrant agreement upon which defendant relies, the Robert Trump Warrant Agreement, by its terms is inapplicable to plaintiffs' warrants. It is irrelevant to the analysis here that the Robert Trump Warrant Agreement was included as an exhibit to the 1993 10-KSB. Nor does the Corporation's assertion, in its 1996 report filed with the SEC, informing its shareholders and/or prospective shareholders that plaintiffs' warrants were subject to the reverse one-for-five stock split, make that assertion accurate. Indeed, the evidence submitted compels the conclusion that the statement contained in the Corporation's 1996 Form 10-KSB simply lacked any foundation in fact.

Thus, the parties' full agreement was contained solely within the stock warrants themselves. Even without a companion warrant agreement, stock purchase warrants represent a continuing contractual obligation to sell the specified securities (*see*, 19 Fletcher, Cyclopedia of Corporations § 2:60, at 83 [perm ed]), although they are not themselves securities (*cf.*, UCC 8-102 [a] [15]). Like option contracts in general, a stock warrant is " 'essentially an enforceable promise not to revoke an offer' " (*In re Riodizio, Inc.*, 204 Bankr 417, 422, quoting *In re III Enters.*, 163 Bankr 453, 460-461, *affd sub nom. Pueblo Chem. v III Enters.*, 169 Bankr 551). "It is a unilateral contract until exercised; upon exercise, it becomes a bilateral contract" (*In re Riodizio, Inc.*, *supra*, at 422).

Defendant believes it to be "axiomatic" that a stock warrant necessarily converts in exactly the same manner as existing common stock converts upon any sort of adjustment to the form of the stock. However, this is an unfounded assumption. Indeed, the very reason for the standard issuance of warrant agreements simultaneously with stock warrants is to define (and limit) the parties' rights under the warrants. If stock war-

rants were deemed automatically adjusted upon consolidations or reclassifications of corporate stock, so that they maintained their proportionate value, there would be no need for the use of warrant agreements to establish the concept of proportional adjustment of stock warrants.

The majority, employing an analysis grounded in "common sense," reasons that the parties "must have" intended for the stock warrants issued to plaintiffs to be altered in the same proportions as actual shares of stock would be by any stock split occurring during their effective period. However, resort by a court to its subjective view of common sense is not a proper basis for a legal conclusion, particularly when it ignores both plaintiff's assertion of what the parties negotiated and intended, as well as "[t]he cardinal rule of contract interpretation * * * that, where the language of the contract is clear and unambiguous, the parties' intent is to be gleaned from the language of the agreement and whatever may be reasonably implied therefrom" (*H.K.S. Hunt Club v Town of Claverack*, 222 AD2d 769, *lv denied* 89 NY2d 804).

"[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" (*W.W.W. Assocs. v Giancontieri*, 77 NY2d 157, 162). There is nothing ambiguous about the terms of these stock warrants; they clearly provide that plaintiffs have an absolute right to purchase the named number of shares at the stated price within the defined time frame.

Furthermore, while a new contract provision may be added by a court if the additional term is "essential to a determination" (Restatement [Second] of Contracts § 204), the majority's assertion that "the parties omitted what is undeniably an essential term of the agreement" is simply incorrect, since clearly the agreement can be enforced by reference solely to the terms contained in the document. These terms—amount, price, and time frame—constitute all the essential elements of the agreement. The term the majority believes to have been accidentally omitted amounts to merely a possible condition or limitation.

The majority's insertion of a limitation cannot be accurately characterized as a simple construction of the document's terms. Rather, the majority is actually altering a basic, definite term of the contract, as to the price at which plaintiffs were entitled to purchase stock of the corporation. However, the rules of contract construction do not permit an alteration of a clear contract term, based upon a change in circumstances not provided for by the parties at the time of the contract.

"Generally, once a party to a contract has made a promise, that party must perform or respond in damages for its failure, even when unforeseen circumstances make performance burdensome" (*Kel Kim Corp. v Central Mkts.*, 70 NY2d 900, 902). For instance, in *Boret v Vogelstein & Co.* (188 App Div 605, *affd* 230 NY 573), the parties' contract provided that the price of the subject copper ore would be determined by reference to the prevailing price as published by the Engineering and Mining Journal at the time of delivery; then, when war with Germany was declared in 1917, the United States Government statutorily reduced the price of copper, which lower price was adopted by the Engineering and Mining Journal. The Court explained that "[p]arties cannot be relieved from the performance of their contracts merely [because the performance of the contracts might have been rendered difficult or burdensome], but only where by acts of law the performance thereof has become impossible or illegal" (*id.*, at 611-612, citing *Baker v Johnson*, 42 NY 126; *City of Yonkers v Yonkers Elec., Light & Power Co.*, 173 App Div 477).

In view of the definitive language of the contract, grafting limitations or conditions onto those warrants amounts to re-writing the contracts, and may not be justified as the application of logic or common sense (*see, Smith v Stowell*, 256 Iowa 165, 125 NW2d 795; *Sanders v Wang*, 1999 Del Ch LEXIS 203, 1999 WL 1044880 [Del Ch Ct, Nov. 8, 1999]).

In *Smith v Stowell* (*supra*), the plaintiffs held an option entitling them to repurchase from the defendant 10 shares of stock in the event he decided to dispose of them. Subsequently, the bank issued, as a stock dividend, three new shares for each share held. When the defendant thereafter sought to dispose of his shares, the plaintiffs claimed the right to purchase not just 10 shares at the set price, but a total of 40, including the 30 which constituted the dividend on the first 10. The court rejected the plaintiffs' position, explaining:

> " 'The court may not rewrite the contract for the purpose of accomplishing that which, in its opinion, may appear proper, or, on general principles of abstract justice, or under the rule of liberal construction, make for the parties a contract which they did not make for themselves, or make for them a better contract than they chose, or saw fit, to make for themselves, or remake a contract, under the guise of construction, because it later appears that a different agreement should have been

consummated in the first instance, *or in order to meet special circumstances or contingencies against which the parties have not protected themselves.*

" 'Likewise, the court may not alter a contract for the benefit of one party and to the detriment of the other or others, or make a new contract at the instance of one of the parties, or, by a process of interpretation, relieve one of the parties from the terms to which he voluntarily consented, or, because of equitable considerations, obviate objections which might have been foreseen and guarded against' "[3] (*Smith v Stowell, supra,* 256 Iowa, at 172, 125 NW2d, at 799 [emphasis added], quoting 17A CJS, Contracts, § 296 [3], at 89-98 [1963]).

In *Sanders v Wang (supra)*, a corporation's key employee stock ownership plan authorized the compensation committee to grant up to 6 million shares of common stock to certain key executives under certain stated conditions. The plan contained no provision authorizing an adjustment of the number of shares that could be awarded in view of any stock splits. Yet, when conditions permitted a grant of stock to the key executives, the compensation committee took into account three intervening "three for two" stock splits, and awarded a total of 20.25 million shares—the equivalent of 6 million shares adjusted for those three stock splits. The court rejected the argument that authorizing a grant of 6 million shares translated to an intent to award 3.75% of the company's equity, or about $1.08 billion worth of stock, justifying the increase of awarded shares to 20.25 million. It held that in the absence of an express provision in the plan authorizing an increase in the maximum shares to be awarded in the event of a stock split, the award of more than 6 million shares was unauthorized and improper (*Sanders v Wang,* 1999 Del Ch LEXIS 203, 1999 WL 1044880, *supra*).

In modifying the parties' rights based upon their presumed intention in the event of future stock splits, the majority adopts the reasoning of the First Circuit Court of Appeals in *Cofman v Acton Corp.* (958 F2d 494). The crux of *Cofman* is that when the parties gave no thought to the eventuality of a reverse

---

3. While parts of this general statement of law may be inapplicable when a court considers a contract which is unenforceable in part, such as an employment contract containing an overbroad restrictive covenant (*see, Lamp v American Prosthetics,* 379 NW2d 909 [Iowa]), it remains a valid precept, and nothing in the *Lamp* decision overrules its basic point.

stock split, which thereafter occurred, the omission constituted an ambiguity, and the court could infer the parties' presumed intention on that issue by " 'reference to all of its language and to its general structure and purpose and in the light of the circumstances under which it was executed' " (*id.*, at 498, quoting *Radio Corp. v Raytheon Mfg. Co.*, 300 Mass 113, 117, 14 NE2d 141, 143).

Nothing in the language of the stock warrants or their general structure and purpose gives rise to an inference that the parties intended plaintiffs' rights to be automatically altered in the event of a stock split. Moreover, assuming that the purported omission creates an ambiguity, determination of the parties' intent is an issue of fact requiring consideration of the extrinsic evidence submitted by the parties (*see, Amusement Bus. Underwriters v American Intl. Group*, 66 NY2d 878, 880). Here, the extrinsic evidence that must be considered in determining the parties' intent includes the assertions of plaintiff Reiss, who explained that he "specifically refused to accept FPC warrants if the 'Warrant Agreement' language was included[, and] the defendant corporation acquiesced."

The majority seems to reject Reiss's assertion out of hand, suggesting in a footnote that it is flatly contradicted by plaintiffs' brief on appeal. This is incorrect. Rather, plaintiffs' appellate brief simply contains an elaboration of Reiss's assertion in his affidavit, merely adding a specific reference to the event of a reverse stock split, by stating that Reiss had refused to accept the warrants if they were made subject to a warrant agreement *which provided for a proportionate change of entitlement in the event of a reverse stock split*. Even ignoring the assertions contained in the brief, Reiss's affidavit alone suffices to create an issue of fact as to whether the absence of any term providing for an alteration of rights in the event of certain eventualities, such as a reverse stock split, was negotiated and intentional, rather than accidental.

Accordingly, at the very least, the finding of an ambiguity by omission creates a disputed issue of fact regarding the parties' intent, which must be resolved at trial. In concluding that the parties "could not have" intended an outcome in which a reverse stock split would have no effect on plaintiffs' rights, the majority weighs the evidence and rejects a factual assertion, neither of which is appropriate in the context of a dismissal or summary judgment motion.

In order to justify inclusion in the agreement of a new term that limits rights set forth in the document, the majority also

offers the novel proposition that the court must consider not only the situation at hand, but what the parties' legal positions would be if the reverse situation had occurred. In other words, the majority is making a factual finding that plaintiffs necessarily would not have advanced the same argument had a forward stock split occurred instead,[4] in order to reject the plaintiffs' position in the context of a reverse stock split.

Interesting and, perhaps, commonsensical as this proposition at first appears, it has no foundation in the law of contract construction. First of all, this appeal should not be decided by reference to what legal position plaintiffs would take had the reverse situation occurred. The question of what plaintiffs intended when entering into the stock warrant arrangement must be answered based upon what the parties did and said, not upon what the court assumes they would be inclined to argue in a hypothetical situation.

Moreover, had a forward stock split taken place, plaintiffs need not have taken a position contrary to that they take here. Initially, they would have had the option they had all along: to decline to purchase shares whose value was lower than the option price. Additionally, in the event the Corporation effectively reduced the value of warrants by arranging for a forward stock split, the warrant holders would be entitled to challenge the Corporation's conduct as violative of its obligation of good faith and fair dealing; they would not necessarily have to seek an alteration of the terms of the contract.

The concern expressed by defendant, namely, that plaintiffs will unfairly reap a "windfall" if their warrants are not deemed to have been automatically altered by operation of the Corporation's reverse stock split, should not affect the court's analysis of the situation. While an aversion to applying the precise terms of the contract under consideration here is at least facially understandable, the law of contracts offers no relief simply because the contract, as applied, may be unfair. This windfall could have been avoided by inclusion of standard terms and conditions referable to the stock warrants, a precaution which, for whatever reason, the Corporation did not take in this instance.

Finally, as a practical matter, it should be recognized that the majority's ruling amounts to a reformation of the contract,

---

4. The majority buttresses its factual conclusion regarding the plaintiffs' intent by referring to counsel's response to a question at oral argument. Of course, counsel's statements cannot properly be the basis for a finding as to the clients' intent.

in the absence of proper grounds. "Reformation is * * * solely for the purpose of stating correctly a mutual mistake shared by both parties to the contract * * * when it clearly and convincingly appears that the contract, as written, does not embody the true agreement as mutually intended" (*Nash v Kornblum*, 12 NY2d 42, 46). Here, there was no mutual mistake in that there was no agreement to any terms other than those in the warrants, the provisions of the warrants were all intended, and no intended provision was accidentally omitted. Nor was there any fraud which resulted in a unilateral mistake on the part of the plaintiffs which would have induced the contract (*see, Barclay Arms v Barclay Arms Assocs.*, 74 NY2d 644). What the present circumstances amount to is, at best, merely a unilateral mistake, namely, a mistake on the part of the Corporation to make provision in the terms of the document for the possibility of an alteration in the character of the stock.

Accordingly, I would reverse to the extent of reinstating plaintiffs' first cause of action for declaratory relief.

SULLIVAN, P. J., WALLACH and RUBIN, JJ., concur with FRIEDMAN, J.; SAXE, J., dissents in part in a separate opinion.

Order, Supreme Court, New York County, entered September 22, 1998, modified, on the law, to the extent of issuing a declaration in defendant's favor, and otherwise affirmed, without costs. Order, same court, entered December 18, 1998, modified, on the law and the facts, to the extent of vacating the sanctions imposed, and otherwise affirmed, without costs.